THE KIMBERLEY SCHOOL, PROSECUTOR-APPELLANT, v. TOWN OF MONTCLAIR ET AL., DEFENDANTS-RESPONDENTS.

Argued February 21, 1949—Decided April 4, 1949.

*Mr. Robert F. Darby (Messrs. Harrison & Roche & Darby, attorneys)* argued the cause for the appellant.

*Mr. John Ferguson* argued the cause for the respondent Town of Montclair.

The opinion of the court was delivered by

VANDERBILT, C. J. The present appeal has been brought to review a determination of the former Supreme Court dismissing a writ of *certiorari* and in effect affirming the judgment of the Division of Tax Appeals which denied an exemp-

tion from taxation for the years 1944, 1945 and 1946 on the real and personal property owned and used by the prosecutor for school purposes.

The Kimberley School is a private day school in Montclair having a total enrollment of approximately 230 students, drawn in the main from Montclair and neighboring communities. It was founded in 1906 by Miss Mary K. Waring and was thereafter operated by Miss Waring and Miss Mary A. Jordan as co-owners until 1941. At that time the prosecutor corporation was organized under the act dealing with corporations not for pecuniary profit, *R. S.* 15:1–1 *et seq.*, for the purpose of operating the school. The certificate of incorporation and by-laws stipulate that the school "shall be conducted without profit to the members of the corporation and no part of the net earnings shall inure to the benefit of any individual." It is therein further provided that in the event of dissolution, the net assets of the corporation "shall be considered as a trust fund for educational purposes to be distributed as such by the then trustees * * * to such other educational institution or institutions then organized and existing under the laws of the State of New Jersey as shall have been incorporated for purposes other than pecuniary profit and shall be maintained and operated without profit to the members thereof and no part of the net earnings of which shall inure to the benefit of any individual * * *." Should the trustees fail to make such distribution within a reasonable time, provision is made for distribution "to such educational corporation or corporations as shall be designated by the Chancellor of the State of New Jersey."

Commencing with the fall term in 1941, the prosecutor took over and continued the operation of the school until 1943 under lease from the two owners. In September, 1943, the school properties were sold to the prosecutor by Miss Waring and Miss Jordan for approximately $50,000. The purchase price was paid by the assumption by the corporation of two existing mortgages on the school lands and buildings amounting roughly to $10,000, by paying $1,000 each to Miss Waring and Miss Jordan, and by giving each of them

a bond in the amount of $19,000, both bonds being secured by a single purchase money mortgage. The bonds provided for interest at the rate of five per cent. and for amortization of the principal sums. Beginning October 1, 1946, the amortization payments in any one year were to be increased in limited amounts by one-half of an amount equal to thirty-two per cent. of the net tuitions of the preceding school year in excess of $68,000 but not in excess of $78,000. The purchase price represented merely the value of the land and the physical plant, Miss Waring and Miss Jordan making an outright gift to the corporation of all of the equipment and personal property of an estimated worth of $10,000 as well as of its good will. Two special funds made up of donations from parents and alumnae aggregating more than $6,000 had earlier been turned over to the corporation by the former owners.

Following the sale, the school has functioned under the management of the prosecutor corporation as owner. No substantial changes in the operation of the school were made by the board of trustees of the corporation, who serve without remuneration and among whom are included Miss Waring, Miss Jordan, Mrs. Helen B. Mason, who is the headmistress of the school, and a number of prominent business and civic leaders of the community. Barring a slight increase in tuition fees and teaching salaries, it has been conducted in much the same fashion as it was under private management and ownership. And it is not disputed that, during the period of private ownership, Miss Waring and Miss Jordan drew salaries ranging between $1,200 and $2,500 apiece for many years, reaching a maximum of $3,600 each in 1929 and 1930.

In the school year ended June, 1943, which it has been stipulated shall control for the three tax years here in question, the total income of the school from all sources amounted to $60,323.94. Of this amount $56,062.17 was received from tuition charges. Three special endowment funds, aggregating slightly in excess of $5,000, produced $103.30 and gifts received that year amounted to $758.41. The balance of income of $3,400 was received mainly from registration fees

and the sale of books and lunches. Expenditures totaled $57,522.86, leaving an excess of income over expenses of $2,601.08, without any charge having been set up for depreciation of the physical assets. By far the largest item of expenditures was for teaching salaries, which it should be remarked in passing were very modest. Of a teaching staff numbering twenty-seven or twenty-eight, only three were receiving salaries exceeding $2,000 per annum and two of them held important administrative positions. Tuition charges, scaled from $150 in the lower grades to $450 in the upper grades, are average for comparable schools in the area. Some scholarships are granted, varying from eight per cent. to eleven per cent. of the income received from tuition. Although lunches and transportation to and from the school are available to those students desiring these services, they are furnished at additional cost to the students and are not covered by the tuition charges.

The claim for exemption in this cause is predicated upon the terms of *R. S.* 54:4–3.6, an omnibus section of the Tax Act dealing with a wide variety of institutions having a recognized public interest. To clarify its proper interpretation we quote the statute with the provisions relating to educational institutions italicized:

"The following property shall be exempt from taxation under this chapter: *All buildings actually used for colleges, schools, academies or seminaries;* all buildings actually used for historical societies, associations or exhibitions, when owned by the State, county or any political subdivision thereof; all buildings actually and exclusively used for public libraries, religious worship or asylum or schools for feeble-minded or idiotic persons and children; all buildings used exclusively by an association or corporation formed for the purpose and actually engaged in the work of preventing cruelty to animals; all buildings actually and exclusively used and owned by volunteer first-aid squads, which squads are or shall be incorporated as associations not for pecuniary profit; all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes, or for one or more such purposes; all buildings owned or held by an association or corporation created for the purpose of holding the title to such buildings as are actually and exclusively used in the work of two or more associations or corporations organized exclusively for

the moral and mental improvement of men, women and children; the building actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State, to an amount not exceeding five thousand dollars ($5,000.00): *the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above-mentioned and to no other purpose and does not exceed five acres in extent; the furniture and personal property in said buildings if used in and devoted to the purpose above-mentioned; provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit,* except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided, the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes. *The foregoing exemptions, shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed.*"

Following a line of decisions of which *Carteret Academy v. State Board,* 102 *N. J. L.* 525 (*Sup. Ct.* 1926); affirmed *per cur.,* 104 *N. J. L.* 165 (*E. & A.* 1927), and *Dwight School v. State Board of Tax Appeals,* 114 *N. J. L.* 594 (*Sup. Ct.* 1935); affirmed *per cur.,* 117 *N. J. L.* 113 (*E. & A.* 1936), are representative, the former Supreme Court held that the test to be applied was whether the purposes and objects of the school claiming exemption were fundamentally charitable or philanthropic, and, being of the opinion that the conduct of this school by the prosecutor corporation did not meet these standards, it denied the exemption.

[X] The plain language of the statute, however, merely requires that the school be "not conducted for profit," and does not impose on it the additional requirements which it demands of charitable, benevolent and religious organizations before they are eligible for exemption from taxation. The restrictions which the provisos in two successive clauses place on property "used for charitable, benevolent or religious purposes" or "used for said charitable, benevolent or religious

purposes" before allowing exemption from taxation obviously do not apply to educational institutions, which may or may not be charitable, benevolent or religious in purpose. That the intent of the Legislature to place educational institutions in a different category from charitable, benevolent and religious bodies was deliberate is indicated by the difference in the language used in the first proviso of the section, immediately preceding the provisos just mentioned: "provided *in case of all the foregoing,* the buildings, or the land on which they stand, or the associations, corporations or institutions using and occupying them *as aforesaid,* are not conducted for profit." Had the Legislature intended not to make a distinction excluding educational institutions from every proviso in the section except the one last quoted it would not have gone to the pains to use the distinguishing language which it did in the latter part of the same sentence. It should be noted in passing that the several classes of exempt institutions as well as the several provisos are all carefully set off by semicolons, and in the *Supplement to the Compiled Statutes, 1925–1930, p.* 1796, the several classes of exempt institutions are set off by the capital letters A to F, educational institutions being designated (A). In the annotations to the *Compiled Statutes of* 1910 (*IV, pp.* 5081–5082), school lands and buildings, religious purposes and charitable purposes are treated separately.

Neither expressly nor by reasonable implication does the wording of this section of the statute impose the requirements that an educational institution be fundamentally charitable or philanthropic in object and purpose in order that it may enjoy tax exemption. True, this latter test has been employed in most of the decisions on this subject in this State over the past thirty years. When it is observed, however, that this criterion originated solely through the inclusion within the same paragraph of the then applicable statute, *P. L.* 1903, *c.* 208, *art. I,* § 3, of the provisions for exemption from taxation of schools not conducted for profit and the provisions for exemption from taxation of religious and charitable organizations, *Montclair v. State Board,* 86 *N. J. L.* 497, 499

·(*Sup. Ct.* 1914); affirmed *per cur.,* 88 *N. J. L.* 374 (*E. &
A.* 1915), grave doubt is cast upon this interpretation. This
circumstance furnishes no basis for judicially grafting on the
statute as to the exemption from taxation of educational in-
stitutions not conducted for profit such a departure from the
test set forth in the plain and unambiguous language used by
the Legislature.

A survey of the legislative history of the tax exemption of
educational institutions in this State confirms this point of
view. So vital to the public welfare has the education of its
citizens been deemed in this State that from the earliest days
of the Republic "school houses, although not formally ex-
empted by the tax laws in force prior to 1851, were seldom
if ever assessed in any part of the State. This omission was so
obviously proper and so entirely in accordance with the public
sentiment that it universally prevailed, and was in fact a
contemporaneous construction of the laws this court would
probably have sanctioned had the question been formally
raised," *State v. Collector of Jersey City,* 24 *N. J. L.* 108,
120 (*Sup. Ct.* 1853). The education of citizens living in a
democratic state and governed by a representative government
has long been a subject of such fundamental public concern,
by the very nature of such government, as to justify the grant-
ing of immunity from taxation to institutions of learning,
for no greater threat to sound government in a democracy
can be conceived of than an illiterate or uneducated electorate.
So strong in the legislative mind was this salutary policy that
in the enactment of the first statute in this State dealing
with exemptions from taxation educational institutions were
granted tax exemption regardless of whether or not the insti-
tution was operated for profit, *P. L.* 1851, *p.* 272. It was
not until the passage of the Tax Act of· 1903 (*P. L.* 1903,
*c.* 208, *art. I,* § 3) that the present test of whether an edu-
cational institution was operating at a profit found its way
into the law to correct selfish abuses that had arisen under the
original tax exemption statute of 1851.

The act of 1851 is revealing, moreover, with respect to the
question raised in some of our cases as to the asserted intent

of the Legislature to qualify the exemption to educational institutions by requiring them to be of a charitable, benevolent or religious nature. The pertinent portion of that act reads (*P. L.* 1851, *p.* 272) :

"5. *And be it enacted,* That the following persons and property shall be exempt from taxation, viz.  *  *  *

"II. All colleges, academies, or seminaries of learning, public libraries, school houses, and all buildings erected and used for religious worship, the lands whereupon the same are erected, the furniture thereof, and the personal property used therein ; pews in churches, grave yards not exceeding ten acres of ground, and all buildings erected and used exclusively for charitable purposes, with the lands on which they are erected, and the furniture used therein ; also the engines and apparatus of any individual or company used for extinguishing fires."

The separation of the clause dealing with schools, libraries and houses of religious worship from the clause concerning grave yards and charitable institutions appears to have been carried down in substantially the same form to the enactment of the Tax Act of 1903. In that act the tax exemption to educational institutions was for the first time qualified by the requirement that they be not conducted for profit and, as so qualified, it still continued to be separated from other exemptions, standing alone in a single clause, divorced from even the exemptions dealing with libraries and houses of worship with which it had been linked in the act of 1851. The significant portion of this statute provided as follows (*P. L.* 1903, *c.* 208, *art. I,* § 3, 4 *C. S.* 5079) :

"The following property shall be exempt from taxation under this act, namely :  *  *  *

"(4) *All buildings actually and exclusively used for colleges, schools, academies and seminaries not conducted for profit;* also all buildings actually and exclusively used for public libraries, religious worship, or for asylums or schools for feeble-minded or idiotic persons and children, and owned by corporations of this state authorized to carry on such charities, and the land whereon the same are situated necessary to the fair use and enjoyment thereof, not exceeding five acres in extent for each, the furniture thereof and personal property used therein, and the endowment or fund held exclusively for the charitable purposes of the corporation owning such buildings ; the parsonage

and the land whereon the same stands to an amount not exceeding five thousand dollars owned by any religious corporation of this state while actually used by the officiating clergyman thereof; also all buildings used exclusively for purposes considered charitable under the common law, or belonging to any society or incorporated company formed for the purpose and actually engaged in the work of preventing cruelty to animals, with the land whereon the same are erected and which may be necessary for the fair enjoyment thereof; and the furniture and personal property used therein, * * *."

In the 1918 revision of the Tax Act (*P. L.* 1918, *c.* 236, *art.* 2, § 201, *para.* (4)), the several classes of institutions to which tax exemption was granted are again set forth in a series, each class being separated from the others by semicolons, with general clauses and provisos following, all in the same legislative language with slight changes which are not material here as in the section of the statute presently under consideration, *R. S.* 54:4–3.6, *supra;* see also 2 *C. S.* 3484; *Suppl. to C. S.* 1796, and the intervening statutory amendments cited in these two Supplements. The consistent and repeated scheme of separate legislative treatment of tax exemption for educational institutions in successive legislative enactments for nearly a century would seem to negative completely any possible basis for applying the charitable, benevolent and religious criterion to educational institutions, any decisions to the contrary notwithstanding.

It is our conception that the test imposed by the statute is simply, in the words of Mr. Justice Swayze, whether or not the school is "conducted for the purpose of making a profit" (*Institute of Holy Angels v. Bender,* 79 *N. J. L.* 34, 36 (*Sup. Ct.* 1909); see also *Princeton v. State Board of Taxes,* 96 *N. J. L.* 334, 339 (*Sup. Ct.* 1921)). Each institution seeking exemption must be examined in the light of its past and present scheme of operation to determine its eligibility, due regard being had not so much for the question of whether its income exceeds the cost of operation in any particular year or years, but rather whether charges are fixed with the obvious intention of yielding a profit. Although necessarily viewed as a whole, the many facets of the organization and the operation of a school must each be considered and its significance

appraised. Thus, in the application of the statutory test, the court will look to the background and nature of the organization of the school; the character and nature of the membership of its board of trustees or other governing body, particularly where former private owners are there represented; the amount of its income as compared with its costs of operation; the amount of any excess of income over costs, and the actual and possible use of such excess; the existence and extent of its accumulated surplus and the purpose to which it may be put; and the amount of tuition charges as compared with those of similar schools; the scale of salaries paid to its teachers and officials as compared with similar schools, public as well as private; and the many other factors bearing upon the ascertainment of the dominant motive in the conduct of the school which need not now be detailed.

In thus adopting the test which in our opinion comports with the legislative intent, we are not to be understood as in any way reflecting upon the soundness of the ultimate decisions reached in the cases that have applied the standard of charitable or philanthropic object and purpose, much as we differ with their reasoning. A review of those cases will demonstrate that a proper result was reached in every instance judging each case by the legislative standard of whether this educational institution is being conducted for the purpose of making a profit. Thus, in the case of *Montclair v. State Board,* 86 *N. J. L.* 497 (*Sup. Ct.* 1914); affirmed, 88 *N. J. L.* 374 (*E. & A.* 1915), which first enunciated the principle that a school must be fundamentally charitable or philanthropic to entitle it to an exemption, the facts clearly indicate the continuance of a privately owned institution as a commercial enterprise under the guise of a non-profit association with the former owner receiving the same substantial salary as before, free rent and living expenses for himself and his family and all surplus income. Similarly in the cases of *Carteret Academy v. State Board,* 98 *N. J. L.* 868 (*E. & A.* 1923) and *Carteret Academy v. State Board,* 102 *N. J. L.* 525 (*Sup. Ct.* 1926); affirmed, 104 *N. J. L.* 165 (*E. & A.* 1927), the former Supreme Court found, among other things, the

incorporation of the school as a non-profit corporation to be a subterfuge by which there was a mere change of "corporate dress" and alteration of the financial structure resulting in the distribution of net income in the form of interest to bond-holders instead of dividends to the private owners as thereto-fore, marking it as a business endeavor with a profit motive. Likewise in *Princeton Country Day School v. State Board,* 113 *N. J. L.* 515 (*Sup. Ct.* 1934) all of the net income was distributable to the original investors in the form of interest and redemption payments on notes held by them. The case of *Dwight School v. State Board of Tax Appeals,* 114 *N. J. L.* 594 (*Sup. Ct.* 1935) ; affirmed, 117 *N. J. L.* 113 (*E. & A.* 1936), presented a clear example of a profit motivated enter-prise, the school netting a surplus of over $100,000 in the five year period immediately preceding the assessing date, the total accumulated surplus exceeding $200,000, and with no charter or other binding provision to control the ultimate disposition of the school assets upon dissolution. In *Dana College v. State Board of Tax Appeals,* 14 *N. J. Misc.* 308 (*Sup. Ct.* 1936) ; affirmed, 117 *N. J. L.* 530 (*E. & A.* 1937), the circumstances appear to have been such that the prior owners were in much the same position after the incorpora-tion of the institution as a non-profit organization as they had been during the previous operation as a group of privately owned institutions, the net income to all practical intents and purposes ultimately being received by the former owners. *Rider College, in City of Trenton v. State Board of Tax Appeals,* 127 *N. J. L.* 105 (*Sup. Ct.* 1941) ; affirmed, 128 *N. J. L.* 320 (*E. & A.* 1942), bore the obvious brand of an essentially commercial undertaking, with an accumulated surplus between $140,000 and $165,000, and a net income of $17,000 for the tax year in question after the payment of substantial salaries to its managing and teaching staff and to seven "salesmen" as well as the expenditure of $18,000 for other advertising. In *College of Paterson v. State Board of Tax Appeals,* 131 *N. J. L.* 57 (*Sup. Ct.* 1943), the school was simply a means of furnishing a living to the original owners and founders, a man and wife, by providing them with living

quarters in the single building used for school purposes along with small salaries.

Although the result of these cases may thus be sustained, the opinions therein in so far as they apply an incorrect legislative standard may lead to future error. The difficulty seemed to have originated in *Montclair v. State Board,* 86 *N. J. L.* 497 (*Sup. Ct.* 1914) at *p.* 499: "A reading of the fourth paragraph of section 3 (of *P. L.* 1903, *c.* 208, *art. I, supra*) will disclose that the exemptions therein granted relate to institutions of a religious, philanthropic or charitable character." But a reading of the first clause of the section in question will disclose a category of educational institutions, set off by appropriate punctuation from charitable, benevolent and religious institutions. The Court of Errors and Appeals in affirming the former Supreme Court *per curiam* did not repeat the error; it merely agreed with the former Supreme Court as to its power to find as a fact that the institution in question was conducted for profit, 88 *N. J. L.* 374, 375 (*E. & A.* 1915). *Carteret Academy v. State Board,* 98 *N. J. L.* 868 (*E. & A.* 1923) is a *per curiam* affirmance of a *per curiam* opinion of the former Supreme Court, holding, at *p.* 870, that the case "falls short of convincing us that the character of the organization is fundamentally charitable or philanthropic, as was found from the facts to be the case in *Institute of Holy Angels v. Bender,* 79 *N. J. L.* 34, and in *Mayor, etc., of Princeton v. State Board,* 96 *N. J. L.* 334, and because it clearly appeared in those cases that they were not carried on for profit but were fundamentally philanthropic and charitable, they were held to be exempt from taxation." But this assertion ignores the rationale of the opinion in the *Institute of Holy Angels* decision at *pp.* 35-36: "But clearly the charge for board would not make the school one conducted for profit, unless it was shown, as it is not, that the charge was in excess of the cost. We do not mean to say that, even if that had been proved, it would suffice to bring the school within the words of the statute; it is not enough that a profit should be made. The school must be conducted for the purpose of making a profit: *i. e.,* as a commercial enterprise, in order to be

deprived of its exemption," and it gets no support from the *Princeton case* which flatly states the issue, 96 *N. J. L.* 334, at *pp.* 338-339 : "The question being whether the school is 'conducted for profit' (so as to defeat exemption) within the meaning of the act, the test is not whether there is or may be a profit, but whether the school is conducted for the purpose of making a profit."

In the second *Carteret Academy case,* 102 *N. J. L.* 525 (*Sup. Ct.* 1926), affirmed on the opinion below, 104 *N. J. L.* 165 (*E. & A.* 1927), the Supreme Court injected two new conditions into the statute (at *p.* 529) in commenting on the *Princeton case, supra:* "But manifestly, this court there found the statutory essentials which constitute the basis for such an application, *i. e.,* the absence of profit in those interested, and the existence of a status of self-abnegation, and sacrifice, upon the part of all concerned in the interest of the local public good, very much as was found in *Institute of Holy Angels v. Bender.*" We have already quoted the *ratio decidendi* of these two cases to quite different effect. The courts in the second *Carteret case* were obviously confusing the incidental with the essential and in the process overlooking the plain provisions of the statute and the rationale of the two cases relied on by them. There is a third condition which appears here for the first time in our cases :

"Exemptions from the burdens of taxation, which the great masses of the people are called upon to sustain, as a requisite of civil government, are only favored in legislation, upon the theory that the concession is due as *quid pro quo* for the performance of a service essentially public, and which the state thereby is relieved *pro tanto* from the necessity of performing, such as works of charity and education, freely and charitably bestowed, as evidenced by the legislation under consideration. Without that concurring prerequisite, an exemption becomes essentially a gift of public funds at the expense of the taxpayer, and indefensible both under our public policy of equal taxation, and our constitutional safeguard against illegal taxation." (102 *N. J. L.* 525, 528-529)

The *quid pro quo* is a familiar element of the action of debt, where it has a precise, technical, and long established meaning, 8 *Holdsworth, History of English Law* 4, 6; *Mait-*

*land, Forms of Action at Common Law,* 63, that bears no relation to the term as here employed. The concept of *quid pro quo* as a condition of tax exemption casts its shadow on the opinion in *Princeton Country Day School v. State Board,* 113 *N. J. L.* 515 (*Sup. Ct.* 1934) at *p.* 520, and elsewhere. The term *quid pro quo* implies a quantitative exactness that cannot possibly be applied in measuring the benefits to the public from the existence of educational institutions. It erroneously suggests that the benefit is confined to the municipality in which the school is located, whereas in fact the advantages of educational institutions are not confined to the respective localities in which they are situated. Undeniably it is the public benefit resulting from education that justifies granting schools and colleges exemption from taxation, but such benefit cannot be exactly admeasured either on the part of the schools or of the public.

In the *Rider College case* [*City of Trenton v. State Board of Tax Appeals,* 127 *N. J. L.* 105 (*Sup. Ct.* 1940)] in addition to the various criteria imposed in some of the earlier cases of charity, philanthropy and self-sacrifice the former Supreme Court, at *p.* 112, projects a new test of the charitable or philanthropic basis of operation of the school. It is there suggested that because every class in our population was not proportionately represented in the student body of the school in question a fundamental lack of charitable and philanthropic purpose was disclosed. For this test there is an entire lack of justification in the statute and in law. Our law has never frowned on charity or philanthropy because it was not universal in its objectives or in its choice of beneficiaries. Thus far has a misinterpretation of the statute proceeding for the exemption of educational institutions led us astray from the plain and simple test prescribed by the statute. The spurious judicial gloss which has gradually encumbered the statute over the last quarter century should be wiped out to effectuate the clear legislative intent of ascertaining whether or not the school is being "conducted for the purpose of making a profit." Of the wisdom of the legislative policy in exempting educational institutions from taxation where the profit-making motive is absent there can be no doubt. The

need for enlightenment and training is as great, if not greater, today as at any time in the nation's history. Our sole function is to determine on all the facts, present and past, whether the school in question was being run for the purpose of making money.

A consideration of the various significant features of the operation of the Kimberley School impels the conviction that it was not being conducted for profit as of the controlling assessing date. Even during the years of private operation it can hardly be said that profit was the dominating object of Miss Waring and Miss Jordan. The modest salaries drawn by each of them when coupled with the fact that as of the close of the 1941–1942 school year after some 35 or 36 years of operation the unexpended income account was only $11,615.75 without any reserve for physical depreciation tells its own story. Moreover, the terms of the sale of the school to the prosecutor corporation appear to have been eminently fair. The purchase price did not include anything for good will or personal property or equipment, but only the fair value of the land and physical plant. The rate of interest on the unpaid purchase price is reasonable as is the rate of amortization. If it be objected that part of the income is being used to pay interest and amortization on outstanding mortgages, the answer is twofold: first, the proviso requiring all income to be used for charitable, benevolent and religious purposes does not apply, as we have shown, to the separate statutory category of educational institutions, and second, even if the proviso did apply to educational institutions, the use of some of its income to pay interest or amortization on a mortgage is an educational purpose. There is no requirement in the statute that an educational institution must be free of mortgage debt to be tax exempt. The statute was not intended to aid merely wealthy schools which least need such help. The school was not burdened with a disproportionate indebtedness in favor of the former owners so as to result in the siphoning off to them of the excess income, a favored device in some of the earlier cases to defeat the statute. Although amortization payments are subject to increase beginning October 1, 1946, the increase is limited in amount accord-

ing to a fixed formula having no direct relation to surplus income. The present owners receive no ·salaries, no rent or board or other indirect compensation.

■ Concededly, an educational institution which regularly each year nets a proportionately large excess of income over and above its reasonable and proper operating and other expenses will be viewed with suspicion, but on the other hand it is not essential that a school habitually function at a loss in order to enjoy exemption from taxation. Sound management decrees that there be available for contingencies a reasonable reserve, no matter how styled. And where, as here, there is only a relatively small endowment dedicated to special purposes and not generally usable for normal operating expenditures, the existence of an unexpended income account which, when the excess income of some $2,800 for the 1942–1943 school year is added to it, totals slightly over $14,000, is not deemed unreasonable. It must not be overlooked that tuition rates are not excessive but are in keeping with those charged by similar schools, and that the scale of teaching salaries is low. A small general increase to the teaching staff alone would have completely disposed of the excess. The surplus of income, moreover, was calculated without making any charges for depreciation on what is patently an old physical plant or setting up reserves for the emergencies which inevitably overtake the owner of any building. Nor may the provisions of its certificate of incorporation and by-laws concerning the distribution of its net assets upon dissolution be disregarded as evidence of the good faith of the prosecutor.

Viewed as a whole we can find nothing in the operation of Kimberley School which runs contrary either to the intent of the statute or to its underlying policy to grant exemption from taxation to educational institutions where they are not run for the purpose of making a profit. The judgment of the former Supreme Court is accordingly reversed.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, BURLING and ACKERSON—5.

*For affirmance*—Justice WACHENFELD—1.