115 N.J. Super. 360 (1971)
279 A.2d 878
THE CHESTER THEATRE GROUP OF THE BLACK RIVER PLAYHOUSE, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
THE BOROUGH OF CHESTER, DEFENDANT-RESPONDENT, AND STATE OF NEW JERSEY, DIVISION OF TAX APPEALS, DEPARTMENT OF TREASURY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 25, Decided July 6, 1971.
*361 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. Alan D. Rubenstein argued the cause for appellant.
Mr. Francis A. Bock argued the cause for respondent Borough of Chester (Messrs. Orr & Bock, attorneys).
Mr. George F. Kugler, Jr., Attorney General of New Jersey, filed a statement in lieu of brief on behalf of respondent Division of Tax appeals (Mr. Herbert K. Glickman, Deputy Attorney General, of counsel).
Messrs. McCarter & English filed brief on behalf of The Playhouse Association, Inc., amicus curiae (Mr. Nicholas Conover English, of counsel).
Messrs. Lum, Biunno & Thompkins filed brief on behalf of The Chatham Community Players, amicus curiae (Mr. William B. Lum, of counsel).
The opinion of the court was delivered by CARTON, J.A.D.
The Chester Theatre Group of the Black River Playhouse (Group) appeals from an order of the Division of Tax Appeals (Division) affirming the denial by the Morris County Board of Taxation of a real property exemption under N.J.S.A. 54:4-3.6.
The Group is a New Jersey nonprofit corporation organized "to stimulate, perpetuate and develop interest in the dramatic arts and to educate the general public in the arts." Its charter provides that no part of any income shall inure *362 to the benefit of any private shareholder, member or individual. Upon dissolution the assets of the corporation are to be distributed only to such organizations whose purposes are similar and which enjoy exemption from federal income tax.
Parenthetically, we note that the Group has been exempted from both the New Jersey state sales tax and from federal income tax as an educational institution.
The Groups owns what is commonly called the Chester Theatre (Block 13, Lot 1), situated at the corner of Grove and Maple Streets in the Borough of Chester. For tax purposes the municipality assessed the property at $4200 in 1966 and $3575 in 1967.
The theatre property was acquired by the Group in May 1966 and has been used exclusively for drama workshops, plays, displays of art and productions of music since that time. All activities[1] have been conducted on a nonprofit basis. Membership in the Group is open, but one need not be a member to participate in the Group's activities. And, although an admission price of about $2 is normally charged for performances, that fee is "just enough to support [the Group's] function." The Theatre seats about 125 persons. None of the performers receives any compensation.
The music and drama activities offered in the workshops are similar to those offered by high schools and colleges as part of the educational curriculum. At the hearing before the Division, Dr. Robert W. Young, superintendent of schools, related that although the West Morris Regional School District maintained a dramatic arts program, no such program is offered in the adult education sector "[b]ecause there is a good center in Chester * * * for adults * * *. *363 [T]here is not a demand for this [area of study] because there is an active group [referring to the Chester Theatre Group] in the community * * *." The school system has also utilized the Chester Theatre for at least one school production.
Apart from offering children's programs locally, the Group maintains a traveling company which has performed before 4,000 children throughout the country. This company rehearses in the Chester Theatre.
The Division concluded that the organization does not meet the statutory requirements for exemption that it be "actually and expressly used for the moral and mental improvement of men, women and children."
In pertinent part N.J.S.A. 54:4-3.6, adopted under the authority of N.J. Const. (1947), Art. VIII, § I, par. 2, provides:
The following property shall be exempt from taxation under this chapter: All buildings actually used for colleges, schools, academies or seminaries; * * * all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes, * * * all buildings owned by a corporation created under or otherwise subject to the provisions of Title 15 of the Revised Statutes and actually and exclusively used in the work of one or more associations or corporations organized exclusively for charitable or religious purposes, which associations or corporations may or may not pay rent for the use of the premises or the portions of the premises used by them; * * * the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed 5 acres in extent; * * * provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided, the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes. The foregoing exemption shall apply only where the *364 association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed * * *. [Emphasis added]
Whether the Division's ruling is correct requires consideration of whether the Group's property is "actually and exclusively used in the work of [an] association(s) and [or] corporation(s) organized exclusively for the moral and mental improvement of men, women and children." A conclusion that the property is not used for such purposes would require a consideration of the alternative grounds urged for exemption that the building is used for "religious, charitable or hospital purposes or for one or more of such purposes," or for a "school" as that term is contemplated by the Legislature. These issues must be considered in harmony with the general principle that ordinarily all property should bear its just and equal share of the tax burden and that the burden of proof is on the exemption claimant. Presbyterian Homes, etc. v. Division of Tax Appeals, 55 N.J. 275, 283 (1970); Bloomfield v. Academy of Medicine of N.J., 47 N.J. 358, 363 (1966); Princeton University Press v. Princeton, 35 N.J. 209, 214 (1961).
There is no legislative delineation of the "moral and mental improvement" classification in the exemption statute. The cluster of abstract concepts themselves suggests that, at most, only a descriptive definition is contemplated.
Many would assert that anything which pertains to the development or betterment of the mental faculties falls within the concept of "mental improvement." Few would deny that the development of man's awareness of himself and his consciousness of the world around him are laudable in purpose. Viewed in this broad context, does not life itself on a daily basis serve to educate? That some "improvement" or betterment is contemplated does not delimit the unbounded means of learning. "If way to the Better there be, it exacts a full look at the Worst." Thomas Harding, "In Tenebris II."
*365 So, too, philosophers down through the ages have debated what is moral and what morality means. "The notion of morals implies some sentiment common to all mankind, which recommends the same object to general approbation, and makes every man, or most men, agree in the same opinion or decision concerning it." David Hume, "An Enquiry Concerning the Principles of Morals," IX (1751).
We are not required here to give a precise definition of these terms nor to catalog all activities which might fall within their ambit. Despite the uncertainty of the outer bounds of the classification, we are satisfied that the activities of this organization are well within its compass and are not so esoteric as to deny the benefit of the exemption.
Through its dramatic offerings and the presentation of musical recitals the Theatre Group seeks to enrich the experience of its members and patrons and to ennoble and strengthen their character. No study of literature is considered complete by the academic community without including a survey of the works of Shakespeare through Eugene O'Neill. What musical appreciation course would be considered meaningful without some reference to Beethoven and other respected composers  both traditional and modern. The performance of such works generates certain pleasure to some although possibly dismay to others. "The great law of culture is, Let each become all that he was created capable of being; expand, if possible, to his future growth * * *." Thomas Carlyle, "J.P. Richter" (1827).
Contrary to the borough's contention, there need not be direct proof that the Group's productions improve any particular individuals morally or mentally. It is generally accepted that dissemination of literary material through the dramatic arts and the presentation of musical recitations advance the intellectual and social bases of man in general. See Little Theatre of Watertown v. Hoyt, 7 Misc.2d 907, 165 N.Y.S.2d 292 (Sup. Ct. 1956), aff'd o.b. 4 A.D.2d 853, 167 N.Y.S.2d 240 (App. Div. 1957); cf. Stockton Civic Theatre v. Board of Supervisors, 66 Cal.2d 13, 56 *366 Cal. Rptr. 658, 423 P.2d 810 (Sup. Ct. 1967); Springfield Art Ass'n v. Porterfield, 23 Ohio App.2d 267, 262 N.E.2d 880 (Ct. App. 1970).
Through the Theatre's activities the community of Chester and the surrounding areas are provided with a vehicle through which participation in the arts, in stage design and in production management is possible. Further, a general educational purpose is fulfilled in that the public is provided with a means to appreciate these art forms. That a performance of Moliere or Chekhov may delight the viewer and that the performer may enjoy his role is incidental to and does not derogate from the inherent intellectual and educational value of the production. See Little Theatre of Watertown v. Hoyt, supra. Although the scope of the Group's activities is relatively limited by the size and geographical situation of the theatre, the availability of the programs offered advances and benefits the general public morally and intellectually at little or no expense to the individual. See N.J.S.A. 54:4-3.6 which states that "charitable, benevolent or religious work" can be supported by fees without destroying the exemption so long as the organization's activities are not conducted for a profit.
In view of this conclusion we need not inquire as to whether the Group conducts a "school" or is organized for "charitable purposes" within the meaning of N.J.S.A. 54:4-3.6. However, we observe that the Group is organized for general educational purposes and is exempted from federal income tax and state sales tax on that basis. See Little Theatre of Watertown v. Hoyt, supra; but see Little Theatre of Dallas v. Dallas, 124 S.W.2d 863 (Tex. Civ. App. 1939). Compare N.J.S.A. 54:4-3.6 with N.J.S.A. 54:32B-9(b)(1).
We note that there is authority holding theatre and art groups to be "charitable" within the meaning of similar exemption statutes, see i.e., Stockton Civic Theatre v. Board of Supervisors, supra; Springfield Art Ass'n v. Porterfield, 23 Ohio App.2d 267, 262 N.E.2d 880 (Ct. App. 1970). *367 This organization may arguably also be exempt under the theory that it fulfills, either partially or totally, the community need for adult education in the arts (see N.J.S.A. 18A:50-1 et seq.) and offers activities and productions which intellectually and socially advance and benefit not only the individual participants involved but the general public as well.
Since the Group itself is nonprofit and all property controlled by that corporation is irrevocably and exclusively dedicated to its benevolent purposes, we conclude that Chester Theatre fulfills all requisites to an exemption under N.J.S.A. 54:4-3.6.
Reversed.
NOTES
[1] Activities for which the building has been used include a "[James] Thurber Carnival," "All My Sons" (a play by Arthur Miller), an organ concert, workshops for both children and adults, music concerts, a presentation by the Harlem Dramatic Arts Group, another by the Morristown Players of "Electra," and the presentation of children's plays.