PAPER MILL PLAYHOUSE, PLAINTIFF-RESPONDENT, v.
MILLBURN TOWNSHIP, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 15, 1982—Decided December 15, 1982.

Before Judges BISCHOFF, J.H. COLEMAN and GAULKIN.

*Arnold K. Mytelka* argued the cause for appellant (*Clapp & Eisenberg*, attorneys; *Arnold K. Mytelka* and *Kevin R. Jespersen* on the brief).

*Vincent D. Manahan III* argued the cause for respondent (*Herrigel, Bolan & Manahan*, attorneys).

The opinion of the court was delivered by

GAULKIN, J.A.D.

Plaintiff Paper Mill Playhouse made claim to exempt from local property taxes for the 1978 tax year three parcels of real property on which it operates a theater and conducts related activities. The Essex County Board of Taxation denied the claim but the Tax Court reversed that determination and granted the exemption. Defendant Township of Millburn now appeals.

Plaintiff claimed the exemption under *N.J.S.A.* 54:4–3.6, which provides in relevant part:

> The following property shall be exempt from taxation under this chapter: . . . all buildings actually and exclusively used in the work of . . . corporations organized exclusively for the moral and mental improvement of men, women and children . . . , the land whereon any of the buildings hereinbefore mentioned are erected . . . and which is devoted to the purposes above mentioned and to no other purpose . . . ; provided, in the case of all the foregoing, the buildings, or the lands on which they stand, or the . . . corporations . . . using and occupying them as aforesaid, are not conducted for profit. . . .

The parties do not dispute the governing legal principles or the operative facts; they disagree only as to the conclusions to be drawn upon application of the law to the facts. The essence of that disagreement is whether plaintiff should be regarded as "an entertainment enterprise," as urged by the municipality, or "an outstanding New Jersey cultural center," as characterized by plaintiff.

Paper Mill Playhouse is a nonprofit New Jersey corporation formed in 1934 under *Title* 15 of our statutes. Its certificate of incorporation states the corporate purposes as follows:

> SECOND: The purposes for which this corporation are [*sic*] formed are to promote in the County of Essex, New Jersey and elsewhere in the State of New Jersey, and outside of the State of New Jersey, a greater interest in and a greater appreciation of art, music, drama, history, literature, education and the theater, . . . .

Upon dissolution of the corporation its assets must be turned over to another similar charitable organization and cannot inure to the benefit of any individual.

The by-laws of the corporation include the following state-
ment of its purposes:

> Section 2. The purposes for which this corporation is formed are to promote in
> the County of Essex, New Jersey, and elsewhere in the State of New Jersey and
> outside the State of New Jersey within the community served by the theatre, a
> greater interest in and a greater appreciation of art, music, drama, history,
> literature, education and the theatre, and in order to accomplish such purposes,
> by the presentation of concerts, dramas, ballet, and musical performances at the
> theatre owned by the corporation on Brookside Drive in Millburn, New Jersey,
> and other associated means, to form within the organization herein incorporated,
> individual groups or organizations for the particular development and promotion
> of the matters herein specified.

The three adjacent lots for which plaintiff seeks tax exemp-
tion, improved by a theater building and parking lot [1], are
located in the Cultural C zone, defined in the local zoning
ordinance as "an area devoted to cultural activities intended to
enhance the quality of life in the region" in which permitted
uses include "theaters, libraries, museums and similar cultural
centers."

The principal activity conducted on the premises is the presen-
tation of musical and dramatic productions, known by plaintiff
as its "major productions." The major productions are primarily
shows which have been successfully presented on the New York
and London stages. Paper Mill Playhouse negotiates directly
with the playwrights or their representatives to obtain copy-
righted material. It stages its own productions, locates its own
actors and actresses through its permanent casting office locat-
ed in New York City, and contracts with nationally and interna-
tionally known stars to lead its casts. In addition to a fixed
compensation, the stars frequently receive a percentage of net
receipts. The remaining actors and actresses are members of
Actors Equity and are paid union wages. Stagehands, musi-
cians, hairdressers, set designers and similar support personnel

---

[1]Following the tax year here in question the theater was substantially
destroyed by fire, but has since been rebuilt and has resumed operations.

are also union members and paid union wages. Plaintiff maintains a full-time salaried staff, including a producer, manager, ushers and office and maintenance workers; in addition, it frequently employs a press agent and engages in extensive advertising campaigns to publicize its major productions.

The major productions are fairly characterized as "popular" in nature and presentation, including, in 1977, Agatha Christie's "Mousetrap," "Jesus Christ Superstar," "My Fair Lady," "The Ginger Rogers Show," "Shenandoah," "The Belle of Amherst" starring Julie Harris, "A New Year's Eve Special" with Victor Borge, "Good News" with Virginia Mayo and Bert Parks and "Fatal Weakness" starring Eva Marie Saint. The record discloses a theater season of 44 to 46 weeks each year which, in 1977, generated attendance of approximately 200,000 and approximately $1,800,000 in box office receipts. Ticket prices in 1977 ranged from $5 to $11. Although not all of the major productions are financially successful, in the fiscal year ended June 30, 1978 plaintiff's net income was approximately $275,000, largely attributable to the major productions. Plaintiff's policy, as stated at trial by its board chairman and its executive producer, is not to make a profit but rather to charge the lowest possible prices necessary to meet expenses and long-term capital needs; yet its policy is also "to get the best professional presentation of the best shows that are available...."

In addition to the major productions, plaintiff produces programs for children both "on school time" and on Saturdays. These programs, including such shows as "Snow White," "Hansel and Gretel" and "Babes in Toyland," are packaged productions purchased from outside producers. During the calendar year 1977 they generated total attendance of approximately 50,000 and produced a net income of approximately $58,000. Plaintiff also presented the New Jersey Ballet, principally in a two-week production of the Nutcracker Suite at Christmastime, the profits of which were split between New Jersey Ballet and

plaintiff. The New Jersey Ballet appeared at the theater on other brief and infrequent occasions as well, and plaintiff also produced two performances of a Christmas production of Menotti's "Amahl and the Night Visitors" with the Newark Boys Choir.

In support of these activities plaintiff maintains a parking lot and a refreshment concession, publishes a program with advertising and operates a small art gallery in the upper lobby of the theater for the exhibition and sale of the work of local artists. Those ancillary operations produce either a small profit or a small loss, depending on the accounting procedures utilized in reporting the income therefrom.

A certain number of discounted or free tickets are regularly distributed to senior citizens and students, subsidized in part by grants of the New Jersey State Council on the Arts ranging between $3,000 and $7,500 annually. On occasion plaintiff distributes free tickets to charitable organizations.

Plaintiff has been approved as an exempt organization under § 501(c)(3) of the Internal Revenue Code and has qualified for charitable exemption from the New Jersey sales tax; it has also qualified for a special charitable organization mail rate. Private donors, principally corporations, make contributions to plaintiff; in fiscal years 1977 and 1978 such grants totalled approximately $210,000.

Finally, plaintiff points out that in 1972 then Governor Cahill signed a proclamation designating the Paper Mill Playhouse as the "State Theater of New Jersey," and in 1976 then Governor Byrne issued a proclamation declaring June 5, 1976 to be Paper Mill Playhouse Day and urged citizens "to support this outstanding New Jersey cultural institution." In addition, the Millburn Township Committee on two occasions adopted similar resolutions of support for the Paper Mill Playhouse as a "cultural center."

In assaying these proofs, the Tax Court judge properly recognized that to sustain its claim for exemption under *N.J.S.A.* 54:4–3.6 plaintiff was required to show that (1) it is a corporation "organized exclusively for the moral and mental improvement of men, women and children"; (2) the buildings were actually and exclusively used for that purpose and that the subject land was "devoted to such purposes and to no other purpose" and (3) neither the corporation nor the property was "conducted for profit." The judge concluded that plaintiff had sustained its burden of proof with respect to each of these three criteria. We find, to the contrary, that the proofs do not establish that the real property of plaintiff is "actually and exclusively used" for or "devoted" to the moral and mental improvement of men, women and children. We therefore find it necessary to reverse the judgment of the Tax Court.

Interpretation and application of the "exclusive use" requirement of *N.J.S.A.* 54:4–3.6 has been undertaken in a number of reported cases. In *Princeton Univ. Press v. Princeton*, 35 *N.J.* 209 (1961), the Supreme Court found Princeton University Press not entitled to an exemption. The court recognized that there was "no question that the petitioner has been organized exclusively for the mental and moral improvement of men, women and children" and that the publication of scholarly works "carries out not only the purposes for which [the Press] was organized but also performs a valuable public service." *Id.* at 216. But since a substantial portion of the activity of the Press consisted of printing work undertaken for the purpose of making a profit and offsetting losses incurred in the publication of scholarly books, the court found that "in this sense the printing takes on the nature of a commercial enterprise and, therefore, it cannot be said that the property is *exclusively used* for the statutory purpose." [Emphasis in original]. *Ibid.* The court further observed that the conducting of a printing business in support of the publication of scholarly books may indicate that the property is being "indirectly" used for the purpose of

"mental and moral improvement" but not that the property is being used "exclusively" for that purpose. *Id.* at 217.

In reaching these conclusions the court relied in part upon *Sisters of Peace v. Westervelt,* 64 *N.J.L.* 510 (Sup.Ct.1900), aff'd 65 *N.J.L.* 685 (E. & A. 1901), in which exemption was denied to plaintiff for its summer boarding house whose patrons paid for accommodation. Then Justice Gummere found that the use of the property had "no connection" with the charitable purposes of plaintiff "except to a very limited extent"; rather, "the purposes for which it is employed is [*sic*] almost purely commercial." He found unpersuasive the fact that all profits from the boarding house were used in the charitable activity of aid of the needy:

> The fact that the profits of a commercial enterprise are either in whole or in part devoted to charity, certainly does not operate to render the business itself a charity, nor is the property in which it is carried on, by reason of such appropriation of profits used for charitable purposes. [64 *N.J.L.* at 512]

In *Teaneck Tp. v. Lutheran Bible Institute,* 20 *N.J.* 86 (1955), exemption was denied to plaintiff, a religious school, with respect to three buildings occupied by ministers and their families. Each home had an office or study, and although no classes were regularly held in the buildings, students did seek out the ministers at their homes for additional guidance and instruction. The court found that the buildings were not "exclusively used" in plaintiff's educational endeavor but rather that the "predominant utility" of the property was as a residential accommodation. In reaching that conclusion Justice Burling recognized that "in matters of tax exemption the use to which the property is devoted is the essential consideration and not the character or status of the owner." *Id.* at 89–90.

In *Bloomfield v. Academy of Med. of N.J.,* 47 *N.J.* 358 (1966), on the other hand, the Supreme Court reversed the denial of exemption to the Academy of Medicine of New Jersey with respect to its building which contained executive offices, meeting rooms and rooms containing historical material of the Acad-

emy and of medicine in New Jersey. The court found, among other things, that the activities conducted at the building were available and open to the public at large and that in conducting those activities the Academy "does not compete with private enterprise nor does it primarily aid one segment of private enterprise." On the facts recited by it the court concluded that the Academy "performs an important public service through its activities which promote 'the moral and mental improvement of men, women and children.'" *Id.* at 366.

Thus, while the case law holds that proper application of the "exclusive use" test necessarily depends upon the facts of each case (*e.g., Princeton Univ. Press v. Princeton, supra,* 35 *N.J.* at 216; *Bloomfield v. Academy of Med. of N.J., supra,* 47 *N.J.* at 363), it also offers significant guidance as to how the facts should be evaluated. Exemption is not granted merely because the mission of the owner is the "moral and mental improvement" of people, nor is exemption available simply because the profits resulting from the use of the property are ultimately devoted to that purpose. Rather, exemption is to be denied if the activity conducted on the property advances the charitable end only "indirectly" or to a "limited extent" or is in the nature of "a commercial enterprise" or "compete[s] with private enterprise."

Our courts have considered the application of the "exclusive use" test to nonprofit theaters on two occasions. In *Chester Theatre Group v. Chester,* 115 *N.J.Super.* 360 (App.Div.1971), this court reversed a determination of the Division of Tax Appeals which denied exemption. Drawing on such authorities as Hume and Carlyle, the court found that "dissemination of literary material through the dramatic arts and the presentation of musical recitations advance the intellectual and social bases of man in general." *Id.* at 365. The court also properly noted that the fact that a performance "may delight the viewer and

that the performer may enjoy his role is incidental to and does not derogate from the inherent intellectual and educational value of the production."

The court further found that the property of the Group was "exclusively dedicated to its benevolent purposes." That finding was drawn from the facts that the property was used "exclusively for drama workshops, plays, displays of art and productions of music"; that membership in the Group was "open" and that "one need not be a member to participate in the Group's activities"; that none of the performers received any compensation and that the music and drama activities were "similar to those offered by high schools and colleges as part of the educational curriculum." The court concluded that through the Group's activities conducted on their premises "the community of Chester and the surrounding areas are provided with a vehicle through which participation in the arts, in stage design and in production management is possible." *Id.* at 366.[2]

In *New Brunswick v. George St. Playhouse, Inc.*, 2 *N.J.Tax* 407 (1981), the Tax Court granted an exemption to a theater which, the court found, "cannot be materially distinguished from" the theater held exempt in *Chester Theatre Group.* The opinion does not set forth in any detail the nature of the activities conducted by the Playhouse but suggests that the only fact distinguishing it from *Chester Theatre Group* is that "the actors and staff employed by defendant are paid salaries." The court then considered and rejected the municipality's contention that the Playhouse did not qualify as a corporation not conducted for profit, as also required by *N.J.S.A.* 54:4–3.6. It relied upon prior holdings that the test is not "whether its income

---

[2] *See, also, Stockton Civic Theatre v. Board of Supervisors,* 66 *Cal.*2d 13, 423 *P.*2d 810, 56 *Cal.Rptr.* 658 (Sup.Ct.1967); *Department of Rev. v. Louisville Children's Theater,* 565 *S.W.*2d 643 (Ky.Ct.App.1978); *Little Theatre of Watertown v. Hoyt,* 7 *Misc.*2d 907, 165 *N.Y.S.*2d 292 (Sup.Ct.1956); aff'd o.b. 4 *App.Div.*2d 853, 167 *N.Y.S.*2d 240 (App.Div.1957).

exceeds the cost of operation in any particular year or years, but rather whether charges are fixed with the obvious intention of yielding a profit." *Id.* at 412 (quoting *Kimberley School v. Montclair,* 2 *N.J.* 28, 37–38 (1949)). The court concluded that the Playhouse was "not a commercial profit oriented enterprise" and was accordingly entitled to the requested exemption. 2 *N.J.Tax* at 414.

In applying the foregoing principles here, we must be careful to distinguish between the "exclusive use" component of the statutory criterion and the "moral and mental improvement" component. We have no doubt that plaintiff's stated purpose to promote "a greater interest in and a greater appreciation of art, music, drama, history, literature, education and the theatre . . . by the presentation of concerts, drama, ballet and musical performances" is one "for the moral and mental improvement of men, women and children." We also recognize that attendance at theatrical events, whether of a commercial or "popular" nature or otherwise, can be said to promote "moral and mental improvement." The question presented, however, is whether the real property owned by plaintiff is "actually and exclusively used" for those purposes, as that term has been clarified and applied in the caselaw.

■ We regard the facts here to distinguish the present case from *Chester Theatre Group* and *George St. Playhouse* and to require, under the principles discussed, the denial of the exemption sought. The principal activity of the Paper Mill Playhouse is the presentation of its "major productions." Those productions and the manner in which they are selected, cast, designed, produced, merchandised and performed are substantially indistinguishable from the productions and activities of the commercial theater. The theater operates virtually year-round and generates audiences of approximately 200,000 in season. Substantial ticket prices are charged and aggressive advertising is

utilized. The choice of shows is based primarily on their popular appeal rather than the cultural or educational value derived from viewing the performance. Whether "intended" or otherwise, these productions have generated a substantial profit for the theater. Unlike the Chester Theatre Group, plaintiff limits the community to participation only as spectators. The public is not encouraged or permitted to engage in the design, performance or direction of the productions. Plaintiff cannot be said to offer a substitute for community dramatic education. *Cf. Chester Theater Group, supra,* 115 *N.J.Super.* at 362.

In all these respects then, the Paper Mill Playhouse conducts itself in "the nature of a commercial enterprise" and, in fact, competes with the commercial theater. The ancillary activities and community benefits described above, including the children's shows and the free and discounted tickets, are not of such scope or significance to overcome that fact.

Accordingly, we conclude that the property in question was not sufficiently shown by plaintiff to be "actually and exclusively used" for moral and mental improvement of men, women and children. We reach that conclusion with full recognition of the deference to be paid to the findings and conclusions of the Tax Court (*cf. J.B. Williams Co. v. Glaser,* 114 *N.J.Super.* 156, 161 (App.Div.1971)), but also with recognition that *N.J.S.A.* 54:4–3.6, like any statute granting exemption for taxation, is to be most strongly construed against those claiming exemption. *Princeton Univ. Press, supra,* 35 *N.J.* at 214. Our careful consideration of the entire record in light of the statutory language and the applicable caselaw satisfies us that the Tax Court erred in granting the exemption claimed.

The judgment under review is therefore reversed and the matter is remanded to the Tax Court for the entry of an appropriate judgment consistent herewith.