PAPER MILL PLAYHOUSE, PLAINTIFF-APPELLANT, v.
MILLBURN TOWNSHIP, DEFENDANT-RESPONDENT.

Argued November 28, 1983—Decided March 15, 1984.

504

*Vincent D. Manahan, III,* argued the cause for appellant (*Herrigel, Bolan & Manahan,* attorneys).

*Arnold K. Mytelka* argued the cause for respondent (*Clapp & Eisenberg,* attorneys; *Anthony K. Mytelka* and *Kevin R. Jespersen,* on the briefs).

*Vincent J. Apruzzese* argued the cause for *amici curiae* George Street Playhouse, New Jersey Theatre Group, New Jersey Ballet Company, New Jersey Symphony Orchestra, New Jersey State Opera, Brendan T. Byrne, William T. Cahill, Robert B. Meyner, Maureen Ogden, Alexander B. Lyon, Jr., Margaret Q. Hager and Richard L. Amster (*Apruzzese & McDermott,* attorneys; *Vincent J. Apruzzese* and *Philip B. Whitcomb,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue is whether Paper Mill Playhouse (Paper Mill), a nonprofit corporation, is entitled to an exemption from local property taxes under *N.J.S.A.* 54:4–3.6. The property is located in Millburn, New Jersey, and consists of three adjacent lots on which the theater and its parking lot are located.[1] In 1978 the property was assessed at a value of $404,600. It is the only property located within Cultural C Zone, defined in the Township of Millburn (Millburn) zoning ordinance as "an area devoted to cultural activities intended to enhance the quality of life in the region."

The Essex County Board of Taxation denied Paper Mill's request for an exemption from local property taxes. The Tax Court reversed the County Board and granted the exemption.

---

[1] In 1980 the theater was substantially destroyed by fire, but has been rebuilt and has resumed operations.

On appeal the Appellate Division 188 *N.J.Super.* 18 reversed the Tax Court and denied Paper Mill the exemption. We granted certification, 93 *N.J.* 309 (1983),[2] and now reverse.

## I

Since 1913, New Jersey's policy has been to exempt from local property taxes property actually and exclusively used by nonprofit corporations for the moral and mental improvement of men, women and children. *N.J.S.A.* 54:4–3.6, which governs these exemptions, provides, in pertinent part:

> The following property shall be exempt from taxation under this chapter: * * * all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children * * * provided, in case of all the foregoing, the buildings, or the lands upon which they stand * * * are not conducted for profit * * *.

▮▮▮ To secure an exemption for its real property, a corporation must meet the following three criteria:

(1) it must be organized exclusively for the moral and mental improvement of men, women and children;

(2) its property must be actually and exclusively used for the tax-exempt purpose; and

(3) its operation and use of its property must not be conducted for profit.

The issue here is whether Paper Mill meets these criteria and is therefore entitled to exemption from local property taxes. For the reasons given below, we are satisfied that Paper Mill meets each of the three statutory criteria for exemption under *N.J.S.A.* 54:4–3.6. In making this judgment, we recognize that statutes granting exemptions from taxation are to be strictly

---

[2]We permitted George Street Playhouse, New Jersey Theatre Group, New Jersey Ballet Company, New Jersey Symphony Orchestra, New Jersey State Opera, Brendan T. Byrne, William T. Cahill, Robert B. Meyner, Maureen Ogden, Alexander B. Lyon, Jr., Margaret Q. Hager, and Richard L. Amster to appear as *amici curiae.*

construed against those seeking exemption, "but that principle does not justify distorting the language or the legislative intent." *Boys' Club of Clifton, Inc. v. Jefferson*, 72 *N.J.* 389, 398 (1977). As Justice (then Judge) Sullivan in interpreting the words "actually and exclusively used" which appear in *N.J.S.A.* 54:4–3.6 wrote in *Princeton v. Tenacre Found.*, 69 *N.J.Super.* 559, 563 (App.Div.1961):

> However, the basic inquiry always is the legislative intent as expressed in the statute. To that end the construction, while strict, must always be reasonable, and words are not to be given a rigid scholastic interpretation when it appears that they were used in another sense. The rule of strict construction must never be allowed to defeat the evident legislative design.

*See Deubel v. Kervick*, 33 *N.J.* 568, 574 (1960).

## II

In 1934 Paper Mill was incorporated as a nonprofit corporation under *N.J.S.A.* Title 15. Its purposes as set forth in its Certificate of Incorporation are to promote "a greater interest in and a greater appreciation of art, music, drama, history, literature, education and the theater [in New Jersey]." The same purposes are set forth in Paper Mill's bylaws, with the additional requirement that in order to accomplish such purposes, "concerts, dramas, ballet and musical performances [should be presented] at the theatre owned by the corporation * * * in Millburn, New Jersey * * *."

Paper Mill presents a wide variety of events, including its own major productions of musical and dramatic plays; special, "On School Time," and Saturday programs to introduce children to the theater; and productions of various musicals, ballets, and plays in conjunction with other cultural groups such as the New Jersey Ballet Company and the Newark Boys' Choir. All of these events are presented live at Paper Mill.

Paper Mill is governed by a Board of Trustees who serve without compensation. Daily management responsibilities are handled by a paid professional staff that includes an executive producer, a manager, ushers, clerical workers, and maintenance workers.

The Executive Producer and his staff decide what productions will be performed. Their policy is to present the best theater Paper Mill is capable of producing. The major productions include musicals and dramas representative of the theater presented in New York and London. According to the unchallenged testimony of the Executive Producer, the productions are not chosen to make a profit. Indeed, Paper Mill does not limit its losses by closing financially unsuccessful productions before their scheduled runs and, in fact, more than one-half of the productions result in a loss.

Paper Mill, under the direction of its Executive Producer, stages most of its own productions, negotiates directly with the playwrights to obtain copyrighted material, and locates its own actors and actresses through its permanent casting office in New York City. To present the high quality theatrical productions, it sometimes engages established stars to appear in its productions. Because of Paper Mill's well-known reputation, sometimes the stars are willing to take lower than a competitive salary when appearing. Occasionally these stars receive a percentage of net receipts, in addition to a salary. The remaining actors and actresses are members of Actors Equity and are paid union wages.

Paper Mill also engages, on a part-time basis, a press agent, set designers, hairdressers, stage hands, and musicians. Its advertising is not extensive and consists primarily of advertising in newspapers. It does not advertise on radio or television or by posters in cabs or buses.

Paper Mill's audience is drawn primarily from Northern New Jersey. The uncontroverted testimony is that it does not compete with commercial New York theater, but with regional theaters such as McCarter Theater in Princeton, The Whole Theater in Montclair, and George St. Playhouse in New Brunswick. Paper Mill's policy is to set its ticket prices as near cost as possible. Accordingly, the ticket charges for major productions

in 1977 ranged from $5.00 to $11.00, or approximately one-half of the price charged by New York commercial theaters.

In 1977 the major productions presented at Paper Mill were:
"The Belle of Amherst" starring Julie Harris;
"The Mousetrap;"
"The Fatal Weakness;"
"Jesus Christ Superstar;"
"My Fair Lady;"
"The Ginger Rogers Show;"
"Good News;"
"Grease;"
"Shenandoah;"
"The Nutcracker" with The New Jersey Ballet;
"New Year's Eve Special" with Victor Borge.

The theater season in 1977 (as in other years) lasted 44 to 46 weeks; and a total of approximately 200,000 people attended the major productions.

In addition to its major productions, Paper Mill produces programs to introduce children to, and to interest them in, professional theater and the dramatic arts. Their "On School Time" program is operated in conjunction with various school districts throughout New Jersey, which bring students to the theater during school hours. In 1977 there were 53 performances of 19 productions attended by a total of approximately 50,000 children. Paper Mill purchases most of these productions, which include such shows as "Snow White," "Hansel and Gretel," "Babes in Toyland," and "A Christmas Carol," as well as "Amahl and the Night Visitors" by the Newark Boys Chorus and "Nutcracker Suite" by the New Jersey Ballet Company. The ticket charges for such performances range from $1.50 to $2.25. In addition, Paper Mill provides these same shows to other children in special Saturday performances. Approximately 19,000 children attended such programs in 1977 at an average admission charge of $2.25. Of Paper Mill's total attendees in 1977, over 25% were children who attended the special children's programs.

Paper Mill has a special relationship with the New Jersey Ballet Company, a tax-exempt organization promoting ballet in New Jersey. The Ballet is considered "in residence" at Paper Mill and stages Tchaikovsky's "Nutcracker Suite" there for two weeks each year. In addition, in 1977 the Ballet presented Monday evening ballet performances at Paper Mill. The proceeds of these productions, if any, are shared with Paper Mill. Paper Mill also produced, in conjunction with the Newark Boys Chorus, a tax-exempt organization, several performances of "Amahl and the Night Visitors." There were no profits from these performances.

To allow those who otherwise could not afford the theater the opportunity to enjoy it, Paper Mill in 1977 offered a 25% discount to senior citizens and students. Paper Mill also offered free tickets to various charitable organizations. The New Jersey State Council on the Arts gave special recognition to these programs by contributing a matching grant of $15,000.

Paper Mill receives approximately 94% of its gross income from ticket sales. In addition to its theater activities, Paper Mill maintains a parking lot and a refreshment concession, publishes a theater program with advertising, and operates a small art gallery in the upper lobby of the theater for the exhibition and sale of works by local artists. These ancillary operations produce either a small profit or a small loss depending upon the accounting procedures used in reporting the income therefrom.

Paper Mill's financial situation fluctuated during the five-year period ending June 30, 1979. Its profits and losses from specific operations are set forth below:

|  | 6/30/75 | 6/30/76 | 6/30/77 | 6/30/78 | 6/30/79 |
|---|---|---|---|---|---|
| Theatrical Productions * | $(82,488) | $(259,650) | $(11,369) | $160,036 | $(173,616) |
| Children's Shows | 33,583 | 28,360 | 30,021 | 25,825 | 45,416 |
| On School Time Programs | 31,875 | 37,629 | 38,422 | 18,982 | 21,539 |

| | 6/30/75 | 6/30/76 | 6/30/77 | 6/30/78 | 6/30/79 |
|---|---|---|---|---|---|
| Parking Lots | $ 929 | $ 6,993 | $ 17,423 | $ 20,894 | $12,252 |
| Art Gallery | (2,087) | (2,481) | (2,164) | (1,421) | (2,144) |
| Programs & Concessions | 27,016 | 16,931 | 18,708 | 18,772 | 15,561 |
| Misc. Income (inc. interest) | 6,708· | 15,357 | 21,003 | 32,025 | 58,142 |
| TOTAL | $ 15,536 | $(156,861) | $112,044 | $275,113 | $ 22,850 |

* This figure encompasses expenses for "Dark Weeks" shown on the financial reports.

Paper Mill also receives contributions from individuals and corporations. In the fiscal year ending June 30, 1977, Paper Mill received approximately $100,000 in private donations and in the following fiscal year approximately $115,000. As of June 30, 1977, Paper Mill had accumulated earnings of $323,975 and a donated surplus of $291,905. As of June 30, 1978, the accumulated earnings had increased to $599,088 and donated surplus was $370,533. As of June 30, 1977, its liquid assets were approximately $430,000.

Paper Mill's Certificate of Incorporation provides that upon its dissolution, its assets must be turned over to another similar charitable organization and cannot inure to the benefit of any person. The accumulation of surplus, therefore, cannot benefit any person, group of persons, or for-profit organization.

All of the income and the surplus is rededicated to the operation of the theater. The monies are used to produce theatrical productions, to maintain the theater, and to provide necessary capital improvements, including expansion. In 1977, the building was 108 years old and in constant need of expensive repairs and maintenance. Moreover, Paper Mill began construction of an addition to the theater in 1977. The addition was to provide needed space for craftsmen, dressing rooms, and a rehearsal area. The estimated cost of the construction was $650,000.

Paper Mill is an exempt organization under Section 501(c)(3) of the Internal Revenue Code, exempt from the payment of social security taxes and entitled to a special charitable organization federal mail rate. In addition, since 1966 Paper Mill has

qualified for a charitable exemption from the New Jersey Sales Tax.[3]

Paper Mill's contributions to the State of New Jersey have been widely recognized. Throughout the years Paper Mill has received official recognition from the State of New Jersey for its contributions to the cultural enrichment of the State. On June 20, 1972, Governor Cahill issued a proclamation designating Paper Mill as the State Theater of New Jersey, a distinction Paper Mill still retains. In his proclamation, Governor Cahill extolled Paper Mill's major contributions to the State in its presentation of drama, ballet and, particularly, its programs for children.

On June 1, 1976, Governor Byrne issued a proclamation that likewise extolled the cultural contributions of Paper Mill to the citizens of New Jersey, particularly its special programs for senior citizens and students, and urged "all citizens to support this outstanding New Jersey cultural institution." Millburn also issued resolutions in 1971 and 1974 in support of Paper Mill as a cultural center.

Significantly, this strong support from the State continues. Since a fire destroyed the theater in 1980, the State Legislature, with the approval of two Governors, has appropriated $600,000 to Paper Mill in support of the arts and to aid in the reconstruction of the theater, "a statewide performing arts resource." The State further supports Paper Mill by actively participating in its effort to obtain national and private funding grants.

III

The first statutory requirement Paper Mill must meet is that it is "organized exclusively for the moral and mental improvement of men, women and children." *N.J.S.A.* 54:4–3.6. There is no legislative delineation of the moral and mental improvement

---

[3]Contrary to the characterization in the dissenting opinion, *post* at 528–529 n. 2, we do not rely on these facts. See *infra* at 523 n. 7.

classification in the statute or its legislative history to serve as a definitive guide. Further, the decisional law involving organizations other than theaters that were found to be organized for the moral and mental improvement of men, women, and children are not especially illuminating. *See Boys' Club of Clifton, Inc. v. Jefferson, supra,* 72 *N.J.* 389 (holding without discussion that a Boys' Club campsite, consisting primarily of a mess hall, infirmary, recreation hall, bathhouse, and cabins for campers and staff, furthers the public's moral and mental improvement); *Bloomfield v. Academy of Med. of N.J.,* 47 *N.J.* 358 (1966) (a professional organization that conducts symposia, uses its property to house medical libraries, and allows medical groups to hold meetings on its property furthers society's moral and mental improvement); *Princeton Univ. Press v. Princeton,* 35 *N.J.* 209 (1961) (the publication of scholarly works, which the trade houses would not be apt to publish because of insufficient financial returns, enhances society's moral and mental improvement).

In *Chester Theatre Group v. Chester,* 115 *N.J.Super.* 360, 365 (1971), the Appellate Division confronted the question whether dramatic productions fell within the term "moral and mental improvement." In holding that they did, the court stated: "It is generally accepted that dissemination of literary material through the dramatic arts and the presentation of musical recitations advance the intellectual and social bases of man in general." *See New Brunswick v. George St. Playhouse, Inc.,* 2 *N.J.Tax* 407, 411 (1981). Other jurisdictions also have taken this position. See *Stockton Civic Theatre v. Board of Supervisors,* 66 *Cal.2d* 13, 20, 423 *P.2d* 810, 815, 56 *Cal.Rptr.* 658, 663 (1967); *Greek Theatre Ass'n v. County of Los Angeles,* 76 *Cal.App.3d* 768, 777–88, 142 *Cal.Rptr.* 919, 923 (1978); *Little Theatre of Watertown v. Hoyt,* 7 *Misc.2d* 907, 911, 165 *N.Y.S.2d* 292, 296 (N.Y.Sup.Ct.1956), aff'd. o.b., 4 *App.Div.2d* 853, 167 *N.Y.S.2d* 240 (N.Y.App.Div.1957).

We do not attempt to enumerate all the theatrical activities that might fall within the ambit of moral and mental improve-

ment. Nevertheless, despite our uncertainty about the classification's boundaries, we have no doubt that Paper Mill's stated purpose, *i.e.,* to promote "a greater interest in and a greater appreciation of art, music, drama, history, literature, education and the theater * * * by the presentation of concerts, drama, ballet and musical performances," is for the moral and mental improvement of men, women, and children.

## IV

The second prerequisite for exempt status is that the property must be "actually and exclusively used" for the moral and mental improvement of men, women and children. *N.J.S.A.* 54:4–3.6. Paper Mill contends that the property in question, its theater and adjacent parking lot, is actually and exclusively used for the presentation of live dramatic art, *i.e.,* its various theatrical and cultural productions, and therefore is actually and exclusively used for society's moral and mental improvement.

Millburn contends, however, and the Appellate Division and the dissenting justices agree, that Paper Mill operates like a commercial enterprise and therefore its property is not actually and exclusively used for society's mental and moral improvement. Neither Millburn, the Appellate Division, nor our dissenting colleagues define a "commercial enterprise." Inferentially, the definition involves a combination of the following facts: the professional production of popular shows that attract large audiences; the employment of a full-time salaried staff and the hiring of professional actors and actresses; and the occasional making of a profit from its theatrical production and the retention of such profit as surplus.

The proper application of the "exclusive use" test depends upon the facts of each case. *Princeton Univ. Press, supra,* 35 *N.J.* at 216. The facts here establish that Paper Mill's operation is substantially distinguishable from a commercial enterprise. No commercial enterprise, whose essential purpose is to make money, would follow Paper Mill's policies. A com-

mercial enterprise structures its operations and chooses its productions to make a profit, not to produce the best theater possible based on its limited resources. Commercial enterprises close down unsuccessful plays early and extend the run of successful plays. Commercial enterprises keep the surplus to distribute as profits or dividends; they do not rededicate all their surplus to maintenance, capital improvements, and producing the best theater. Commercial enterprises do not sell their tickets as near cost as possible and then further discount those tickets by 25% for senior citizens and students or given them away to charities. Commercial enterprises do not and could not afford to sell more than 25% of their total tickets at a very low price to children to allow them to attend low-cost, special programs designed to introduce them to the theater. A commercial enterprise, upon its dissolution, sells its assets for its stockholders' benefit; it does not provide that, upon dissolution, its assets must go to other charitable organizations. In short, Paper Mill's organization and operation are "substantially distinguishable" from a commercially operated theater.

It is important also to recognize the tremendous financial support and extraordinary recognition Paper Mill has received from the State of New Jersey, both the legislative and executive branches, through four administrations. The State, by designating Paper Mill as the State Theater of New Jersey, acknowledges the outstanding contributions of Paper Mill to the cultural enrichment of the citizens of the State, particularly those who normally would not be able to experience theater, such as children, senior citizens, and students. Such recognition and financial support are not given ordinarily to a commercial enterprise. In view of such financial support, it is difficult to conceive that the Legislature would intend today that Paper Mill be denied an exemption under *N.J.S.A.* 54:4–3.6.

Paper Mill's position is supported by two New Jersey cases, which address the same issue as present here: whether a theater owned by a nonprofit corporation was used actually and exclusively for society's moral and mental improvement as required

by *N.J.S.A.* 54:4–3.6. In both cases, an exemption was granted. See *Chester Theatre Group, supra,* 115 *N.J.Super.* 360; *George Street Playhouse, supra,* 2 *N.J.Tax* 407.

Chester Theatre Group, a nonprofit corporation under Title 15 of the New Jersey statutes, was organized "to stimulate, perpetuate and develop interest in the dramatic arts and to educate the general public in the arts." *Chester Theatre Group, supra,* 115 *N.J.Super.* at 361. Its property was used for drama workshops, plays, art displays, and productions of music. *Id.* at 362–63. The Appellate Division held that the property was used exclusively for the moral and mental improvement of society.

George Street Playhouse was also a nonprofit corporation under Title 15 of the New Jersey statutes. It was organized to "promote the artistic and cultural welfare of the citizens of New Jersey" and to "encourage young people to become acquainted with drama and participate therein." It presented theatrical performances, conducted drama workshops, and maintained a traveling children's company that presented free dramatic productions to area schools. *George St. Playhouse, supra,* 2 *N.J. Tax.* at 409. The court found that the activities of the George Street Playhouse were "essentially the same as those of the Chester Theatre Group," *id.* at 411, and concluded that it was organized exclusively for society's moral and mental improvement.

Like Chester Theatre Group and George Street Playhouse, Paper Mill is a nonprofit corporation organized under Title 15 of the New Jersey statutes to further the arts. Its property, too, is used for theatrical performances, displays of art, and children's plays.

Millburn, however, faced with what it concedes is the broad holding of *Chester Theatre Group, supra,* 115 *N.J.Super.* at 365, that "dissemination of literary material through the dramatic arts and the presentation of musical recitations advance the intellectual and social bases of man in general," and the adherence of *George St. Playhouse, supra,* to that holding, argues that

these cases are factually distinguishable from the one at bar.[4] Millburn first attempts to distinguish *Chester Theatre Group, supra,* from this case by arguing that only productions of Shakespeare, O'Neill, Moliere and Chekov were produced by the Chester Theatre Group, and not more "entertaining" productions such as Paper Mill sometimes produces. Factually, this is incorrect. Although the opinion does mention such classic playwrights and composers as Shakespeare and Beethoven, the Group's actual productions were similar to those performed at Paper Mill and included, among others, "Electra," "All My Sons," a James Thurber carnival and children's plays, which are arguably entertaining productions. *Id.* at 362 n. 1.

More importantly, the position of Millburn and our dissenting colleagues that a theater that produces popular shows is a commercial enterprise whose property therefore is not exclusively used for society's moral and mental improvement is fundamentally unsound. Implicit in this position is the notion that a successful show cannot improve society's moral and mental outlook. There is no evidence that popular productions fail to further society's moral and mental improvement simply because, coincidentally, they are entertaining. It is well-known that some of today's popular shows become tomorrow's classics. The fact that an exhibit at a museum in terms of both popularity and financial returns is successful, as the King Tut Exhibit or the Vatican Exhibit are, does not mean that it is not culturally enriching. Must a play be unpopular and poorly produced for it to have cultural value? Obviously not. In fact, the reverse is more likely to be the case. Popularity may go in tandem with quality. A professionally and well-produced production generates more popular attraction, and ultimately a greater number of people will be culturally enriched.

---

[4]We note that New Brunswick does not share Millburn's view. Subsequent to the Appellate Division's decision in this case, the New Brunswick Tax Assessor advised the George Street Playhouse that its theater and property would be subject to real estate taxes in 1983.

This distinction is unacceptable not only because it is based upon an incorrect premise but also because of its practical consequences. Decisions about taxability would turn on whether a play was more like "Annie" than "Hamlet." The tax assessor, therefore, would be put in the untenable position of drama critic and by extension, censor, determining whether a specific play promotes society's moral and mental improvement. Worse, nonprofit theaters would be discouraged from presenting valuable new works with no history as to their appeal for fear that the tax assessor would find the new work "popular" and deny them an exemption from property taxes. Certainly, the Legislature did not intend to foster this kind of climate in the administration of its *ad valorem* tax laws.

Indeed, any fine attempt to determine which plays improve moral and mental improvement and which do not is unwise. As the United States Supreme Court once noted:

> What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another. There doubtless would be a contrariety of views concerning Cervantes' Don Quixote, Shakespeare's Venus & Adonis, or Zola's Nana. But a requirement that literature or art conform to some norm prescribed by an official smacks of an ideology foreign to our system.
> [*Hannegan v. Esquire*, 327 *U.S.* 146, 157–58, 66 *S.Ct.* 456, 462, 90 *L.Ed.* 586, 593 (1946) (footnote omitted).]

The statement is as applicable to dramatic literature as it is to prose.

To say that Paper Mill is not used exclusively for moral and mental improvement because it presents "entertainment" is to attempt to make a determination of literary normality. That a performance "may delight the viewer and that the performer may enjoy his role is incidental to and does not derogate from the inherent intellectual and educational value of the production." *Chester Theatre Group, supra,* 115 *N.J.Super.* at 366.

There also is no merit in Millburn's allegation that a theater that employs professionals is significantly different for tax purposes from one that does not. Millburn makes this assertion in its attempts to distinguish Paper Mill's operations from those

of Chester Theatre Group. Significantly, the City of New Brunswick attempted to use this same distinction to establish that the operation of the George St. Playhouse was different from the operation of the Chester Theatre Group. New Brunswick pointed out that during its 1978–79 theater season, George Street Playhouse paid its actors, administrative staff and production staff salaries that totalled approximately $300,000. *George St. Playhouse, supra,* 2 *N.J.Tax* at 409. The court held that this distinction had no effect on the moral and mental improvement of citizens.

> The fact that the actors and staff employed by defendant are paid salaries does not detract from the beneficial effect of defendant's activities upon the public. If anything, the employment of professional actors and staff assures a high standard of quality for all the defendant's undertakings. [*Id.*]

Participation is not essential in learning to appreciate culture. Just as one need not paint to learn to appreciate paintings, one need not act to learn to appreciate dramatic performance. Like the patron at an art museum, the spectator at a theater can be morally and mentally improved by learning to appreciate theater. Any attempt to distinguish nonprofit theaters on the basis that one allows the public to participate in the design, performance, and direction of the productions, whereas the other allows the public to participate only as spectators, is faulty.

Millburn, in support of its commercial enterprise theory, relies principally on a nontheater case, *Princeton Univ. Press, supra,* 35 *N.J.* 209. Its reliance on this case is misplaced and indicates a misunderstanding of the issue.[5] In *Princeton Univ. Press,* we held that the Press morally and mentally improved society by publishing outstanding scholarly works that other publishing companies would be unlikely to publish because of insufficient financial returns. To finance this work, the Press also engaged in traditional profit-making printing work, printing letterheads, examinations, bill heads, football programs, pamphlets, and cat-

---

[5]Our dissenting colleagues appear to share this misunderstanding. See *post* at 527.

alogs for Princeton and other educational and nonprofit organizations. *Id.* at 212. The Press therefore made two separate uses of its facility, one to make a profit and one to morally and mentally improve men, women, and children. The court held that: "Such printing which includes work done for educational and nonprofit organizations other than Princeton University, is undertaken for the purpose of making a profit. Hence, in this sense the printing takes on the nature of a commercial enterprise and, therefore, it cannot be said that the property is *exclusively* used for the statutory purposes." *Id.* at 216.

Similarly, in *Teaneck v. Lutheran Bible Inst.,* 20 *N.J.* 86 (1955) (exemption denied for residential houses occupied by ministers and their families), and *Sisters of Peace v. Westervelt,* 64 *N.J.L.* 510 (Sup.Ct.1900), aff'd, 65 *N.J.L.* 685 (E. & A.1901) (exemption for summer boarding house in which patrons paid for accommodations), two separate and distinct uses were made of the property.

Factually, these cases are dissimilar. In those cases, the property was used for two distinct purposes, one related to the tax-exempt purpose of the organization, the other to a nontax-exempt purpose of the organization. Paper Mill, however, makes only one use of its property; it presents live dramatic performances that further its tax-exempt purpose, *i.e.,* society's moral and mental improvement. Thus, these cases offer no support for Millburn's position.

## V

Millburn also relies on *Princeton Univ. Press, supra,* 35 *N.J.* 209, to support its allegation that the retention of a surplus and the mere fact that Paper Mill occasionally runs financially successful productions makes it a commercial enterprise. We disagree. This is a difficult issue to discuss as Millburn does not allege that Paper Mill was conducted for profit. Instead, it, like the dissenting opinion, alleges that regardless of its intention, because Paper Mill at times realizes a profit and generates a

surplus, it is a "commercial enterprise." This interpretation renders meaningless the third statutory requirement of *N.J.S.A.* 54:4–3.6, that a corporation and its property must not be conducted for profit. Accordingly, Millburn's interpretation cannot be accepted, because "construction that will render any part of a statute inoperative, superfluous or meaningless, is to be avoided." *Abbotts Dairies v. Armstrong,* 14 *N.J.* 319, 328 (1954) (quoting *Hoffman v. Hock,* 8 *N.J.* 397, 406 (1952)); *see Camden City v. Taxation Div. Director,* 4 *N.J.Tax* 458, 468 (1982).

Additionally, to place the issue in perspective, it must be stressed that the facts here do not support Millburn's allegations. The uncontradicted testimony at trial was that Paper Mill is not conducted for the purpose of making a profit, that profitability is not a consideration in determining which shows to produce, and that a production is never closed before its scheduled run because it is losing money at the box office. Whatever surplus exists is reinvested in theatrical productions, maintenance of the theater, or necessary capital improvement, including expansion. Further, for four out of five years, 1975 through 1979, Paper Mill suffered the following substantial losses from its theatrical productions, purportedly the nub of its commercial enterprise: 1975–($82,488); 1976–($259,650); 1977–($11,369); and 1979–($173,616).

Although Paper Mill produced a net income in 1978 from its theatrical productions, that fact alone does not mean that it is conducted for profit. Our cases require a pragmatic inquiry into profitability.[6] The decisions reveal a realistic common sense analysis of the actual operation of the taxpayer; mechanical centering on income and expense figures is to be avoided. As Chief Justice Vanderbilt stated in *The Kimberly School v. Mont-*

---

[6]Although most of the cases that have dealt with this issue have involved schools that must meet a different second criterion to obtain an exemption, they are relevant here because the third criterion, *i.e.,* that the operations and use not be conducted for profit, is the same for schools as it is for institutions for the moral and mental improvement of society. *N.J.S.A.* 54:4–3.6.

*clair,* 2 *N.J.* 28, 37–38 (1949): "It is our conception that the test imposed by the statute is simply, in the words of Mr. Justice Swayze, whether or not the school is 'conducted for the purpose of making a profit'." [Citations omitted.]

Similarly, in *Trenton v. N.J. Div. of Tax Appeals,* 65 *N.J.Super.* 1, 10 (1960), where a real property exemption was granted to Rider College, which had sizable surpluses at the time, the Appellate Division stated:

> We perceive nothing in the statute requiring, as a condition of tax exemption, that a non-profit educational institution must actually operate at a loss, or that it must gear its tuition rates and other receipts so as to avoid an excess of income over current expenditures. To hold that a college may not accumulate a surplus, even though accomplished in some measure by the generosity of donors, without losing tax-exempt status, would be tantamount to declaring that such institutions may not plan on a sound fiscal basis for the replacement of antiquated facilities or the expansion of facilities almost all colleges are finding necessary to accommodate the ever-mounting demands for a college education. The tax statute imposes no such sanction.

*Accord, Boys' Club of Clifton, Inc. v. Jefferson, supra,* 72 *N.J.* at 403–04.

A crucial factor is where the profit goes. As the Appellate Division stated, "[i]f the college does show operational surpluses for some years, the crucial inquiry is, 'Who gets the money?' If we can trace it into someone's personal pocket * * * the college is not entitled to tax exemption * * *." *Trenton v. N.J. Div. of Tax Appeals, supra,* 65 *N.J.Super.* at 12.

None of Paper Mill's surplus can be traced into someone's pocket. Paper Mill pays no dividends to anyone. Although it pays salaries to its staff, its actors, and others, there are no allegations that it pays excessive salaries or bonuses. As long as salaries are not excessive, the mere payment of them is not sufficient grounds for denying the tax exemption. *See The Kimberly School v. Montclair, supra,* 2 *N.J.* at 38; *Trenton v. New Jersey Div. of Tax Appeals, supra,* 65 *N.J.Super.* at 12. Moreover, none of the surplus would flow into someone's pocket

if Paper Mill were dissolved; in that event all its property would have to be distributed to a similar charitable group.[7]

Millburn's reasoning leads to illogical and irrational results. For a nonprofit organization to retain its tax exemption, it would have to lose money or at least do no better than break even. This makes no sense. Ordinary prudent judgment requires that nonprofit organizations, like other organizations, try to generate a surplus for emergencies and, in this case, capital expansion. Here, whatever surplus exists is reinvested in theatrical productions, maintenance of the theater, or necessary capital improvements, including expansion. Retaining a surplus is reasonable, particularly since an addition to the theater was being constructed in 1977. Further, prudence dictates that a surplus be retained due to the wide fluctuations in Paper Mill's income as evidenced by the receipts from theatrical productions.

In cases where we have held that the taxpayer was operating for a profit, the profit arose from the nonexempt operation of the organization. *See Princeton Univ. Press, supra,* 35 *N.J.* 209; *Sisters of Peace, supra,* 64 *N.J.L.* 510. Paper Mill's "actual and exclusive" use of its property, however, is solely in the furtherance of its exempt purpose, the production of live dramatic art for the moral and mental improvement of men, women, and children.

## VI

In conclusion, Paper Mill's operation is substantially distinguishable from a "commercial enterprise." Millburn's allegations are not sufficient to establish that Paper Mill is a "commercial enterprise," whatever such a term connotes. Nor do we share Millburn's concern that commercial enterprises will flock to follow Paper Mill's operation to avoid property taxes. We

---

[7]Paper Mill's nonprofit status has not been challenged for federal tax purposes. While this does not signify that Paper Mill meets all the requirements under *N.J.S.A.* 54:4–3.6, it does support a finding that it is not operated for a profit.

can safely surmise that no commercial enterprise, whose essential purpose is to make money, will follow Paper Mill's policies.

Accordingly, we hold that the property of Paper Mill is exempt from local property taxes under *N.J.S.A.* 54:4–3.6 for the year 1978.[8] Paper Mill meets the three statutory requirements of that statute: it was organized for purposes that further the public's moral and mental improvement; its property was actually and exclusively used to further the moral and mental improvement of society; and its operations and use were not conducted for profit.

We reverse the judgment of the Appellate Division and enter judgment for Paper Mill Playhouse.

CLIFFORD and SCHREIBER, JJ., dissenting.

Property tax cases are not notorious for their emotional appeal. This one is not much different in that regard, although we acknowledge a certain seductive allure to the claim of tax-exempt status by Paper Mill Playhouse—a veritable oasis in an otherwise vast expanse of but modest thespian attainments. Trouble is, the tab has to be picked up by the rest of Millburn's property owners. In this instance, that is both unfair and contrary to the legislative scheme.

As a general rule our statutes seek to impose the public burden of taxation on real property in just and equal share. *Princeton Univ. Press v. Princeton,* 35 *N.J.* 209, 214 (1961). Because statutes granting exemption from taxation represent a departure from this rule, they are construed "most strongly" against those claiming an exemption. *Id.* The burden is on the taxpayer to prove that his property falls within the statutory exempt enclave. *Jamouneau v. Division of Tax Appeals,* 2 *N.J.*

---

[8]Whether Paper Mill will continue to meet the three criteria of *N.J.S.A.* 54:4–3.6 and be entitled to an exemption from property taxes will depend upon whether Paper Mill continues to operate as it did in 1978.

325, 330 (1949). Adherence to these bed-rock principles compels a denial of Paper Mill's claim to an exemption.

That part of the statute, *N.J.S.A.* 54:4–3.6, relied on by Paper Mill for an exemption sets forth three criteria: (1) the association must be organized exclusively for the moral and mental improvement of men, women, and children; (2) its property must be actually and exclusively used for a tax-exempt purpose; and (3) the association using the building must not operate for a profit and the building and land on which it stands must not be used for a profit-making operation. The second of these requirements is at the heart of this dispute—actual and *exclusive* use of Paper Mill's property for the moral and mental improvement of the populace.

The Township's argument, with which we agree, essentially is that Paper Mill is a professional theatre whose major productions represent a commercial endeavor. To the extent that the production phase of its operations takes on the nature of and is a profit-making commercial enterprise, Paper Mill's use of its property is not exclusively for a tax-exempt purpose. It was Paper Mill's burden to establish this exclusivity requirement—a burden that it did not choose to assume until 1978, when for the first time in over forty years it sought an exempt status. This "exclusivity" requirement, a specific of the statute, was put into sharp focus by this Court in *Pingry Corp. v. Hillside Township,* 46 *N.J.* 457, 462–63 (1966).

*Pingry* is important for its tracing of the legislative history of the exemption statute's "colleges and schools" clause; of the original "actually and exclusively used" language, Act of April 8, 1903, ch. 208, 1903 N.J.Laws 394; and of the later deletion of "exclusivity," Act of April 8, 1913, ch. 278, 1913 N.J.Laws 570. Its particular significance lies, of course, in its graphic demonstration of the Legislature's understanding of how to broaden the exemption when it wished to by removing any requirement that the property be used *exclusively* for an exempt purpose—a step it took for colleges and schools but has resolutely refrained

from taking in respect of organizations and associations organized exclusively for the mental and moral improvement of society. *Pingry's* meticulous underscoring of the difference in language between the "colleges and schools" exemption (no "exclusivity" requirement) and the one before us further reveals the irrelevancy of the Court's reliance on school cases. *Ante* at 521–22 (citing *The Kimberly School v. Montclair,* 2 *N.J.* 28 (1949), and *City of Trenton v. New Jersey Div. of Tax Appeals,* 65 *N.J.Super.* 1 (App.Div.1960)).

Even more significant in *Pingry,* which involved the tax-exempt status of seven faculty houses owned by the school, was this Court's analysis of whether those properties were actually used for school purposes. The Court posited the following proposition:

> Where the institution by its rental agreements with its faculty members assumes the role of an ordinary landlord and profits, the purpose to which the buildings are put can be said to only indirectly further the goals of school and thus the finding of "actual use" cannot be found. However, where, as here, the landlord-tenant relationship is secondary to the primary purpose of providing the housing for the faculty on the campus site and *no profit is possible,* an exemption can be justified. [46 *N.J.* at 463 (emphasis added).]

A second significant decision is *Princeton Univ. Press v. Princeton, supra,* 35 *N.J.* 209, which emphasized the importance of the nonexistence of a profit when, in order to qualify for exempt status, the property had to be *exclusively used* for the beneficial purpose of "moral and mental improvement of men, women and children," the same exemption provision as is before us. The statute's "exclusivity" requirement failed of satisfaction because in addition to publishing outstanding scholarly works, Princeton Press did commercial printing work in order to offset the losses it incurred through its purely scholarly pursuits. *Id.* at 216. That work was undertaken for the purpose of making a profit. "Hence, in this sense the printing [took] on the nature of a commercial enterprise and, therefore, it cannot be said that the property is *exclusively used* for the statutory purpose." *Id.* (emphasis in original). That the profit was used to support publication of scholarly books did not alter the

requirement that the property had to be used exclusively for the highly esteemed purposes in its charter.

These cases demonstrate that the taxpayer must prove both (1) that the purpose of the organization qualifies and (2) that in carrying out that purpose, the organization does not use the exempted property for profit making.

Although the commercial nature of Paper Mill's activity may not stand out so starkly as the commerciality in *Princeton Univ. Press,* it is nevertheless unmistakably present. Some of its more important features are that Paper Mill retains a full-time salaried staff, including a producer, manager, ushers and other maintenance workers, and has all the trappings of a full-fledged commercial theatre, such as a press agent, union set designers, hairdressers, stage hands and musicians, and a permanent casting office in New York City. We would not presume to quarrel with the character of its productions, and are prepared to concede for today's purposes that an appearance of Bert Parks or the enormously talented Victor Borge does not of necessity mean that the theatregoer would be deprived of moral and mental improvement; but the list of productions for the 1977 season (that preceding the tax year in question), *ante* at 509, strongly suggests that Paper Mill's management had one eye fixed at least as firmly on filling the house as the other was fixed on uplifting the cultural level of the community.

Equally persuasive to us are the numbers: average income of more than $44,000 for the fiscal years (June 30) 1974 to 1979; $275,000 in earnings for fiscal 1978; earned surplus at the close of fiscal 1977 of $324,000; and earned surplus at the end of fiscal 1978 of $600,000. Its box office receipts from theatrical operations in fiscal 1978 were $1,795,000.[1] These figures indicate at best that the property for which the tax exemption is claimed is being used only indirectly, and not exclusively, for the moral and mental improvement of men, women, and children.

---

[1] Real estate and other taxes during fiscal 1978 totalled $10,816.

The record amply demonstrates that the major theatrical productions command most of the taxpayer's attention; that these are usually limited to already proved commercial entertainment; that Paper Mill makes every effort to hire the highest quality theatrical performers and, consequently, often hires professional stars. These celebrities, in turn, are attracted to the taxpayer's operations, for it has a forty-two-year reputation for superior productions. The major offerings, as the Appellate Division observed, are primarily shows that have enjoyed success on the New York and London stages. These performances have generated a substantial profit for the theater. Moreover, some of the productions are travelling shows, produced elsewhere and booked in to the Paper Mill Playhouse. No one denies that much of this entertainment is staged with the anticipation of producing, and in truth does produce, a profit. Compare this to *Boys' Club of Clifton, Inc. v. Township of Jefferson*, 72 *N.J.* 389, 400 (1977), where profitable usage was *de minimis.*

The majority misconceives the nature of the exemption, seeking to distinguish Paper Mill from a commercial enterprise predicated on a series of factors that heretofore have never been dispositive of the issue of "exclusive" use of the structure in question. The Court starts with the predicate that "[n]o commercial enterprise whose essential purpose is to make money will follow Paper Mill's policies", *ante* at 514 and 523–24. Of course not. The majority relies on features of corporations organized for profit, such as the distribution of assets on dissolution, division of profits, and use of surplus. None of those factors exists in non-profit corporations. *See, e.g., Princeton Univ. Press, supra,* 35 *N.J.* 209. The pivotal question is, does the Paper Mill ever use the theatre to make a profit? [2]

---

[2] Put differently, the pertinent inquiry is whether commerciality has infiltrated Paper Mill's operations so as to destroy its claim of exclusivity of its tax-exempt activities. The majority implicitly accepts the proposition that tax-exempt status of a structure is not lost even though the non-profit

The Township offers a proposal for measurement of commerciality in the theatre context, based upon three factors: (1) what is produced—mainly popular shows that have enjoyed commercial success elsewhere, as distinguished from, say, a repertory company devoted to the classics or an avant-garde ensemble experimenting on new works; (2) how it is produced—sharing of net receipts with big-name stars, full-time paid staff, sophisticated productions, expensive advertising; and (3) with what results—large audiences, substantial revenues. These criteria strike us as reasonable and workable, but we need not for today's purposes cast them in bronze. Certainly as applied to the facts before us they yield but one result: Paper Mill's property is not used exclusively for tax-exempt purposes.

We would affirm.

*For reversal*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

For affirmance—Justices CLIFFORD and SCHREIBER—2.

---

organization intentionally uses the building to make a profit, so long as the profit-making venture arguably is for the mental and moral improvement of its patrons. We do not agree.

Moreover, the Court's fundamental misunderstanding of the issue is compounded by the irrelevance of its reference to the fact that

Paper Mill is an exempt organization under Section 501(c)(3) of the Internal Revenue Code, exempt from the payment of social security taxes and entitled to a special charitable organization federal mail rate. In addition, since 1966 Paper Mill has qualified for a charitable exemption from the New Jersey Sales Tax. [*Ante* at 511–12.]

Federal income tax exemption standards have no relation to state law governing property tax exemption. See *The Presbyterian Homes v. Division of Tax Appeals,* 55 *N.J.* 275, 286 n. 3 (1970).