CONLEY, J.T.C.
In May 1981, the Schizophrenia Foundation completed construction of a new building, known as the Princeton Brain Bio Center, for which it seeks an exemption from local property taxation pursuant to N.J.S.A. 54:4-3.6. Montgomery Township, the taxing district in which the building is located, contends that the property is not “exclusively used” for exempt purposes as is required by the statute.
Some of the procedural history of this litigation was dealt with in Schizophrenia Foundation of N.J. v. Montgomery Tp., 4 N.J.Tax 662 (Tax Ct.1982), rev’d 6 N.J.Tax 439 (N.J.Super. App.Div.1984). That matter involved the added assessment placed on the new construction-by the Montgomery Township tax assessor for the last seven months of 1981. See N.J.S.A. 54:4-63.3. The Appellate Division of the Superior Court held as a matter of law that new construction that had not been completed as of October 1, 1980, and therefore had not been used for exempt purposes as of that date, could nonetheless be entitled to an exemption at the time a 1981 added assessment would otherwise have been made. The Appellate Division remanded the added assessment case to this court to determine whether the property was entitled to an exemption for seven months of 1981.
In the meantime, Montgomery Township denied the Schizophrenia Foundation’s claim for a tax exemption for 1982. The foundation appealed to the Somerset County Board of Taxation, which granted the exemption. The township then filed an action in the Tax Court seeking a reinstatement of the 1982 assessment. This opinion is the determination of the Tax Court for both the 1981 and 1982 proceedings, which were consolidated for trial.
*597 The Schizophrenia Foundation relies principally on the most general provision in N.J.S.A. 54:4-3.6 as the basis for its exemption claim. The exemption for buildings then applied to:
all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes, or for one or more such purposes____[1]
The related exemption applicable to land is for:
the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed 5 acres in extent____
Although the following provision was not referred to until trial, the foundation cites another portion of the statute as additional support for its exemption claim:
all property owned and used by any nonprofit corporation in connection with its curriculum, work, care, treatment and study of feebleminded, mentally retarded, or idiotic men, women, or children shall also be exempt from taxation, provided that such corporation conducts and maintains research or professional training facilities for the care and training of feebleminded, mentally retarded, or idiotic men, women, or children....
Finally, the above-quoted provisions are subject to the following:
provided, in case of ail the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit____ [N.J.S.A. 54:4-3.6]
As noted very recently by the Supreme Court, the proper application of the statutory test depends upon the facts of each case. Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 514, 472 A.2d 517 (1984). The relevant facts in the present case are better understood in the context of a brief discussion of the beginnings of the Schizophrenia Foundation.
The foundation was established in 1967 as a nonprofit corporation pursuant to N.J.S.A. 15:1-1 et seq. (now N.J.S.A. 15A:1-1 et seq.), and in 1968 it obtained a determination letter from the Internal Revenue Service that it was exempt from federal income tax as an organization described in section 501(c)(3) of the Internal Revenue Code. The individuals who formed the *598 foundation were interested professionally or personally in the types of mental disturbance commonly referred to as schizophrenia. Both the certificate of incorporation and the by-laws of the Schizophrenia Foundation set forth the same purposes, which in pertinent part are:
(b) To organize social and information clubs for the benefit of schizophrenic patients, their families, relatives, employers and friends;
(c) To publish and circulate books, pamphlets, or other publications devoted to the dissemination of news and information to the public concerning schizophrenia;
(d) To serve as an agency for the specific purpose of encouraging, supporting and facilitating research in schizophrenia;
(e) To make grants to encourage the study of schizophrenia and the relationship of the schizophrenic patient to society;
(f) To assist the schizophrenic patient to rehabilitate and readjust to society;
(g) To make available to medical doctors published materials dealing with methods of treatment for schizophrenia;
(h) To recommend to hospitals and other institutions the standard of care to which the schizophrenic patient is entitled; [and]
(i) To recognize significant contributions to the cause of promoting the rehabilitation and readjustment of the schizophrenic patient to society by the granting of appropriate awards to those responsible for such contributions____
Two of the original members of the board of trustees of the foundation were on the staff of the Bureau of Research in Neurology and Psychiatry at the New Jersey Neuropsychiatric Institute in Skillman, Montgomery Township. The institute had been created by legislation and was operated by the Department of Institutions and Agencies. N.J.S.A. 30:4-177.12 et seq. One of the trustees of the foundation who had been with the Neuropsychiatric Institute as a medical doctor was Carl C. Pfeiffer, M.D., Ph.D., presently the Director of the Princeton Brain Bio Center. Dr. Pfeiffer had developed a schizophrenia ward at the institute as well as a free out-patient clinic for the treatment of schizophrenic patients. During the course of their treatment and research at the Neuropsychiatric Institute, Dr. Pfeiffer and others discovered that some forms of schizophrenia were related to various bio-chemical imbalances in their patients and that correction of the imbalances in many eases alleviated the schizophrenic symptoms.
*599 According to the testimony of Dr. Pfeiffer, the State terminated its schizophrenia research in 1972. In order to continue their work, Dr. Pfeiffer and several other professionals then established an out-patient clinic known as the Brain Bio Center. The clinic, operating under the legal auspices of the Schizophrenia Foundation, leased space at a shopping center in the Princeton area. In May 1981, the foundation relocated the clinic to the building it had constructed in Montgomery Township. The clinic then took the name Princeton Brain Bio Center to retain the identity it had developed while in Princeton. The present litigation focuses on the use of the foundation’s new building during the time from May 1981 to the end of 1982.
In an information booklet made available to prospective patients and contributors, the foundation explains its present pursuits:
With the move away from the NJ Neuro-Psychiatric Institute, the new Brain Bio Center broadened its field of interest. It was no longer limited to the study of the schizophrenias. At the present time it is actively engaged in the study of many disorders including hypoglycemia, epilepsy, autism, senility, childhood hyperactivity, arthritis, colds, herpes simplex virus, allergic and digestive disorders, heavy metal poisoning due to mercury, cadmium, bismuth, lead, berylium and copper.
According to Dr. Pfeiffer, use of the term “schizophrenia” has become a misnomer for the work done at the Brain Bio Center. The primary emphasis of the center is on the treatment and study of nutritional ailments and of appropriate levels of trace elements in a patient’s system, such as zinc, copper, iron and aluminum. The motto of the center is “We Use Today’s Nutritional Knowledge Today, Not Tomorrow!” Dr. Pfeiffer, whose professional reputation is as a clinical pharmacologist and a nutritionist, described the nature of the treatment offered to patients at the center as orthomolecular psychiatry. This discipline treats a patient’s bio-chemical disturbances on an out-patient basis and with vitamins and minerals, in addition to traditional medication, but without psychotherapy-
The Schizophrenia Foundation employs four medical doctors at the Brain Bio Center, including Dr. Pfeiffer. Each of these *600 staff physicians shares the responsibility for treating the 900 to 1,000 patients who visit the center each year. Three of the physicians devote virtually their entire day to seeing patients. Dr. Pfeiffer spends the first two hours of a typical day on correspondence and professional papers and then sees an average of eight patients. Prospective patients of the center must apply for initial appointments by mail. One or more of the doctors consider each request for treatment and schedule an appointment if it is determined that the applicant’s illness may be treated by nutritional means.
The center employs four nurses in its allergy department, three laboratory assistants who draw blood from patients for testing, five or six laboratory technicians who analyze the blood and urine samples taken from patients, two research biochemists and a nutritionist. There are also a number of nonprofessional support personnel.
The initial visit for most patients lasts approximately two hours. This includes a preliminary interview, consultation with a physician, and laboratory tests. Blood and urine tests are done at the center for trace elements but routine tests are sent out to a commercial laboratory. A typical charge for an initial visit is $268. This is comprised of an $80 physician’s fee and separate fees for specific laboratory analyses, such as $35 for trace minerals, $15 for lead, $20 for manganese, $10 for urinalysis and $9 for blood group and RH factor. A physician reviews the test results when they have been completed and prescribes a regimen of vitamins and minerals for each patient. Most patients purchase their vitamins and minerals at the center’s vitamin counter on their return office visits. These products are sold to patients by the center at 20% above cost as opposed to an apparent 50% to 100% markup at a pharmacy. Dr. Pfeiffer testified that none of the vitamins and minerals require a doctor’s prescription and all can be purchased either at pharmacies or health food stores. The center charges less than the regular markup to induce its patients to complete the treatments recommended for them by the medical staff.
*601 Montgomery Township retained an economist to review certain of the financial records of the Brain Bio Center. This expert concluded that a typical patient’s annual charges at the center for all services, including the purchase of vitamins and minerals, was $1,920. Without having done any such review of actual charges, Dr. Pfeiffer estimated that a typical annual charge was closer to $1,000 a year for any patient. The financial statements of the foundation reflect a total of $936,-868 from patient fees and $543,888 from counter sales of vitamins and nutrients for the calendar year 1981. For 1982, there were cash receipts of $1,180,128 from patient fees and $546,749 from counter sales. For 1983, the same totals were $1,123,837 and $602,384, respectively.
The building in which the Brain Bio Center operates is a modern, one-story structure of approximately 12,000 square feet. The lot on which the building is located consists of 9.93 acres. Within the building are a reception area and waiting room, five offices for staff physicians, seven other individual offices, an allergy department, a library-conference room, a video room, a laboratory where blood samples are taken from patients and a 5,000-square foot laboratory where much of the bio center’s in-house testing of blood and urine is performed.
There are four issues in this litigation: a) whether the Schizophrenia Foundation was organized exclusively for exempt purposes; b) whether, for the tax years involved, the subject property was “exclusively used” for exempt purposes within the intent of N.J.S.A. 54:4-3.6; c) whether the operation of the Schizophrenia Foundation at the Princeton Brain Bio Center was conducted for profit; and d) whether the Schizophrenia Foundation would be entitled to an exemption for its entire tract of 9.93 acres or only for five acres of its property.
I find that the foundation was organized exclusively “for the moral and mental improvement of men, women and children” as required by N.J.S.A. 54:4-3.6. The original purpose of the organization, as stated in its certificate of incorporation and by-laws, was to provide research and community assistance in *602 connection with persons who suffer from serious mental afflictions. This clearly comports with the legislative design as discussed in our case law. See Paper Mill Playhouse v. Millburn Tp., supra, 95 N.J. at 512-514, 472 A.2d 517.
This leads to the next issue, which is whether the property has been “exclusively used” for exempt purposes. In my opinion it has not. Despite the clear statement of the organization’s purpose, the foundation operates in a different manner than was originally intended. Since this issue is dispositive of the litigation, I need not discuss the final two issues.
The most recent application of N.J.S.A. 54:4-3.6 by the Supreme Court was in Paper Mill Playhouse v. Millburn Tp., supra. In that case the Court held that the presentation of live dramatic art in the form of various theatrical and cultural productions was an exclusive use of a playhouse for the moral and mental improvement of men, women and children. Id. at 523, 472 A.2d 517. The Court found specifically that the Paper Mill Playhouse “makes only one use of its property; it presents live dramatic performances that further its tax-exempt purpose, i.e., society’s moral and mental improvement.” Id. at 520, 472 A.2d 517. In so holding, the Court distinguished one of its previous decisions because that case had involved the use of a property for two distinct purposes. Ibid.
The case distinguished by the Court was Princeton University Press v. Princeton Bor., 35 N.J. 209, 172 A.2d 420 (1961). The Court in that matter held that a nonprofit printing and publishing plant affiliated with Princeton University was not entitled to a tax exemption pursuant to N.J.S.A. 54:4-3.6. In language applicable to the present case by analogy, the Court summarized its conclusion as follows:
A substantial portion of the Press’s activity consists of printing work taken in for the purpose of offsetting the losses incurred in the publication of scholarly books. Such printing, which includes work done for educational and non-profit organizations other than Princeton University, is undertaken for the purpose of making a profit. Hence, in this sense the printing takes on the nature of a commercial enterprise and, therefore, it cannot be said that the property is exclusively used for the statutory purpose.
*603 Petitioner contends that the printing business conducted by the Press and the profit derived therefrom are for the purpose of supporting the publication of scholarly books. This fact cannot alter the requirement that the property be exclusively used for the purposes mentioned in the statute. At best, it indicates that the property for which the tax exemption is claimed is being used only indirectly, and not exclusively, for the purpose for which exemption is granted. [Id. at 216-217, 172 A.2d 420]
The Schizophrenia Foundation contends that the revenues it receives from its treatment of patients and from the sale of vitamins and minerals support research and the publication of scholarly works in connection with schizophrenia and nutritional ailments. It also contends that even the treatment of patients is primarily a research effort because the treatment yields data for use in research endeavors. Even if I were to accept the foundation’s contentions at face value, however, I would not be led ineluctably to a conclusion that the subject property is used exclusively for exempt purposes. As noted in the passage quoted from Princeton University Press: “At best, it indicates that the property for which tax exemption is claimed is being used only indirectly, and not exclusively, for the purpose for which exemption is granted.” Ibid.
It is an unavoidable conclusion from the facts adduced at trial in this litigation that the Schizophrenia Foundation uses its property for the medical treatment of 900 to 1,000 patients a year. These patients pay fees which are not dissimilar to fees paid to medical professionals in private practice. The operation of the Princeton Brain Bio Center is in many respects similar to the use of property by medical offices, health clinics and laboratories which operate in a commercial environment. Such a use in no fair sense can be characterized as being “exclusively” for exempt purposes.
Another precedent is City of Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 351 A.2d 756 (N.J.Super. App.Div.1976), aff’d 73 N.J. 179, 373 A.2d 651 (1977). The property tax exemption sought in that matter was for a use for hospital purposes, which at that time was expressly provided for in N.J.S.A. 54:4-3.6 in the same phrase that provided an *604 exemption for religious and charitable uses.[2] One of the properties that was a part of the hospital complex was the hospital clinic building. That structure was used for the hospital’s psychiatric and general medical and surgical clinics. Slightly less than one-fifth of the building was leased by the hospital to a retail pharmacy. The pharmacy had agreed to give a discount on drug purchases by clinic patients. Referring to the rental of a portion of the clinic building to the retail pharmacy, the Appellate Division held that the building was not entitled to an exemption, stating, “[I]t is perfectly obvious that the Clinic Building was not ‘actually and exclusively used’ for hospital purposes.” Id. at 538, 351 A.2d 756.
There is no valid distinction between the existence of the pharmacy at the Monmouth Medical Center and the vitamin counter at the Princeton Brain Bio Center. Each operated in effect as an independent commercial outlet charging patients .something less than the regular retail markup on drugs, vitamins and minerals. These transactions were in competition with other pharmacies or health food stores that have to pay property taxes. The existence of the vitamin counter at the Princeton Brain Bio Center supports a finding that the use of the subject property during 1981 and 1982 was not exclusively for exempt purposes.
The remaining statutory basis for an exemption advanced by the Schizophrenia Foundation is the provision dealing with “feebleminded, mentally retarded, or idiotic men, women or children.” N.J.S.A. 54:4-3.6. The foundation has offered no authority in support of this claim and it made no mention of it in its complaint or county tax board petition. It was raised as an afterthought on the first day of trial. I am satisfied that the use of the Princeton Brain Bio Center does not fall within this statutory language. According to one of the staff physicians who testified at trial, one-fourth or fewer of the center’s patients are treated for mental disabilities of any kind. No *605 proof was offered that the center provides any treatment for the mentally retarded.
For the reasons discussed in this opinion, I hold that the property of the Schizophrenia Foundation is not entitled to a tax exemption for the years in question. The Clerk of the Tax Court will therefore enter judgment affirming the 1981 added assessment and the 1982 assessment on the subject property.

The exemption for hospital purposes was modified by L.1983, c. 224.

See n. 1 infra.